# CORRECTION OF ERRORS,

##### OF THE

## STATE OF NEW-YORK.

Argued in the session of the Court holden in September and October, 1829, and determined in December of the same year.

[CONTINUED FROM THE THIRD VOLUME.]

---

## LANSING *vs.* SMITH and others.

The owner of lands adjacent to the shore of a navigable river obtaining from the commissioners of the land office a grant of land under water, on which he erects a wharf after filling in the same, cannot sustain an *action on the case* against the agents of the company to whom *subsequently* the legislature give the privilege of erecting a mole or pier in the river for the purpose of constructing a basin for the safety and protection of boats, and who erect such mole or pier entirely encompassing the wharf on the side of the water, so as to leave no communication between it and the river but through a sloop lock at one extremity of the basin; although the privileges of such owner of the wharf be materially impaired by the construction of such works, the loss sustained by him is *damnum absque injuria*, for which no action lies.

The grant by the *commissioners of the land office* conveys only the land described in it by metes and bounds, and being in derogation of the rights of the public, nothing is to be taken in favour of it by *implication*; on the contrary, if it be considered as giving the right to erect a wharf, a *reservation* to the legislature to regulate the use of it and of the waters adjacent will be *implied.*

The grant to the company to erect the pier, although subsequent to the former grant, is not a violation of the constitution of the U. S., providing that no state shall pass a law impairing the obligation of contracts, nor of the constitution of this state declaring that private property shall not be taken for

public use without just compensation—the former grant by the commis-
sioners of the land office not precluding the legislature from making a great
public improvement for the benefit of commerce.

Every individual who suffers actual damage, whether direct or consequen-
tial, from a *common nuisance*, may maintain an action for his own particular
injury, although there may be many others equally damnified.

Opinions delivered by Chancellor WALWORTH in favor of affirmance, and by
Mr. Senator S. ALLEN for reversal of the judgment of the supreme court.

ERROR from the supreme court. In 1813 the plaintiff be-
came the owner of a *water lot* in the city of Albany, which in
1804 was granted by the commissioners of the land office of
this state to one W. Quackenboss, who was the owner of a lot
extending from North Market-street to the Hudson River,
which *water lot* was *land under water*, adjoining Quackenboss'
lot on the shore, and extending the whole width of his lot,
which was about 53 feet, east into the river about 250 feet.
The grant to Quackenboss was made by virtue of a general
act of the legislature, enacted the 24th March, 1801, and re-
enacted in 1813, (1 Revised Laws of 1813, page 293,) where-
by the commissioners of the land office were authorized to
grant so much of the lands under the waters of navigable
rivers as they should deem necessary to promote the com-
merce of the state, providing however that no such grant
should be made to any person whatever other than the pro-
prietor or proprietors of the adjacent lands. The plaintiff
filled up the lot covered with water, and constructed a wharf
used for the reception and piling of lumber, viz. boards and
plank.

In 1824 a pier was constructed in the Hudson River, ex-
tending from a dock north of the plaintiff's lot about 1500
feet, called the Arsenal dock, to the foot of Hamilton-street,
about 2800 feet south of the plaintiff's lot, leaving a basin be-
tween the pier and the main land, into which the great Wes-
tern and Northern Canals, after forming a junction, empty.
The work was commenced in 1823. In its progress two
*temporary* bridges were erected for the more convenient
transportation of earth required for the filling in of the pier,
on of which was placed north and the other south of the
plaintiff's wharf; and after the pier was completed, two per-
manent draw bridges were erected from the shore to the pier,

one at the foot of Columbia-street, and the other at the foot of State-street, both south of the plaintiff's lot. At the south end of the basin is the outlet into the river where a sloop lock is constructed, the gates of which however are not shut, and have never been closed but upon one occasion. This work was constructed under the authority of an act of the legislature, passed the 5th April, 1823, (Statutes, vol. 6, b. 128,) whereby a number of persons were appointed a board of commissioners, authorized to raise by *subscription* a sum of money to be expended in the construction of a *mole* or *pier* in the Hudson River, within the bounds of the city of Albany and opposite to the docks fronting the harbor, so as to comprise a basin extending from the State Arsenal dock to a point opposite to a dock below Hamilton-street, for the accommodation of canal boats, vessels and other craft and rafts, of lumber. By the provisions of this act, the commissioners named therein were authorized to adopt all such measures as they might deem necessary and proper for the attainment of the object contemplated by the act, and to appoint from their number three acting commissioners, one of whom was to be designated superintendant, and to make contracts for materials, labor, &c. in the construction of the works. They were required to erect three bridges whenever, in the opinion of the canal commissioners, the public convenience demanded it : two at the termination of streets from the shore to the pier, and the other over the sloop lock, each to be constructed with a *draw*, so as to admit of the passage of vessels and boats ; and when the mole or pier was finished, the commissioners of the land office were required to grant to the commissioners named in the act, or to the survivors of them as *joint tenants*, the land under the water of the Hudson River occupied by the mole or pier and sloop lock. The act fixes the wharfage, upon all vessels entering the basin from the river, at *double* the rate then charged by the owners of the docks encompassed by the pier, one half of which is given to the proprietors of the pier, who are also authorized to charge the same wharfage on vessels lying on the east side of the pier that was then charged by the owners of the docks, viz. *single* wharfage. After receiving the grant from the

land office, the commissioners appointed by the act were re-
quired to divide the pier into lots forty feet in width, and to
sell the same at public auction, dividing the proceeds among
the subscribers to the fund raised for the construction of the
works. The commissioners were further required to con-
struct a sloop lock at the southern termination of the basin,
with the approbation of the canal commissioners, who, on
the completion of the same, were directed to charge tolls on
canal boats, &c. computing the entire length of the basin in
the same manner as if it were part of the canal ; and the in-
crease of tolls paid into the treasury of the state in conse-
quence of such extension of the canal, was directed to be
paid to the proprietors of the pier to be divided among them.
Provision was made for the assessment of damages to lands
adjacent to the basin, overflowed with water by reason of
the erection of the pier and lock, and the consent of the cor-
poration of Albany was required to be obtained and filed.
The *only condition* annexed to the act was, that if the legis-
lature should within five years make provision by law for the
re-payment to the commissioners of the amount expended in
erecting the works, then the grant was to be void ; which
condition was relinquished or discharged by act of the legisla-
ture passed the 20th April, 1825.

In May, 1825, the plaintiff brought an action on the *case*
against the defendants, who were *the acting commissioners*
for the construction of the pier, &c. His declaration con-
tained *five counts ;* in the *first* he stated, that at, &c. he was
seised in his demesne as of fee of and in a certain wharf ad-
joining the river Hudson, and had the free and uninterrupted
navigable communication to and from the said wharf unto
the river with sloops, &c., yet the said defendants well know-
ing, &c. but contriving, &c. on, &c. erected a bridge with-
out a draw across a part of the Hudson and continued the
same, whereby, &c. In the *second* count he charges simply
the erection of a bridge, whereby, &c. In the *third* count
he charges the erection of a bridge without a draw to a cer-
tain mole or pier, whereby, &c. In the *fourth* count he
charges the erection of a bridge without a draw, with a lock
appurtenant thereto, and also the keeping and continuing the
said bridge together with the pier and lock, whereby, &c.

In the *fifth,* count he charges the erection of a lock or gate with a bridge appurtenent thereto, between the wharf of him, the plaintiff, and a dock, called the steam-boat dock, and that the defendants fastened and shut up the said lock or gate, &c. The defendants *pleaded,* 1. Non cul; 2. As to the keeping and continuing the mole or pier and the lock and gate, with the bridge appurtenant thereto, the same had been constructed and were continued in pursuance of the authority conferred by the act of 1823, authorizing the construction of the basin; that the fee of the soil forming the foundation or base of the mole or pier and lock did at the time of the passage of the act remain vested in *the people* of the state and that the defendants, in the character and capacity of public servants and in conformity with the provisions of the act, having been duly appointed acting commisioners, had constructed the mole or pier and lock, and continued the same; 3. Another plea substantially the same as the second. The plaintiff *replied,* setting forth the act of 1801, re-enacted in 1813, the grant to Quackenboss in 1804, the conveyance to himself in 1813, and the erection of a wharf by him; that from the 1st October, 1816, up to the time of the grievances, &c. sloops, &c. were entitled to free and unobstructed navigation to and from the said wharf, into, upon and along the river and to every part of the same, subject only to the payment to the plaintiff of a fair and reasonable wharfage if he thought proper to exact it; but that now the mole or pier encircles or surrounds the wharf on the side of the river, and excludes all communication by sloops, &c. between the wharf and river, except through the sloop-lock, and diverts the water of the river from flowing to the wharf of the plaintiff in the usual and accustomed way; averring that the mole or pier had been erected contrary to the true intent and meaning of the act of 1801, re-enacted in 1813; and that by means thereof and of the sloop lock with the bridge appurtenant thereto, he, the plaintiff, had sustained damage as in his declaration mentioned, in that by means thereof he was prevented and hindred from having a free and unobstructed navigable communication, &c. To this replication the defendants *demurred,* and the plaintiff joined.

ALBANY.
Dec. 1829.

Lansing
v.
Smith.

The cause came on to trial on the issue of fact, at the Albany circuit in February, 1826, before the Hon. WILLIAM A. DUER, than one of the circuit judges. The facts herein before stated were shewn. In addition it appeared, that before the erection of the pier the plaintiff's wharf was used for the piling of lumber, viz. boards and plank, and since its erection the wharf is no longer used for that purpose ; that *three fourths* of the lumber which now comes to Albany is piled on the pier ; that vessels loaded with lumber or hay cannot pass through the lock ; that the plaintiff, before the pier was built, received a rent of from $1,50 to $2 per foot for his wharf ; that the pier, sloop-lock and bridges have reduced the annual value of his wharf one half ; and that during the year 1824 his wharf was vacant and unoccupied. The plaintiff also produced evidence to shew the agency of the defendants in the erection of the *temporary* bridges, insisting that at all events he was entitled to recover for the damage sustained by the erection of them.

The plaintiff having rested, the judge at the circuit, on the motion of the defendants, ordered the plaintiff to be *nonsuited*. The plaintiff excepted to the opinion pronounced by the judge, and the cause was heard before the supreme court on the bill of exceptions and on the demurrer to the replication, which court refused to grant a new trial, and gave judgment for the defendants on the demerrer. (See opinion of court, 8 Cowen, 146.) The plaintiff sued out a writ of error.

*S. M. Hopkins*, for plaintiff in error. The act of the legislature under which the defendants set up a justification is an unconstitutional act, violating the provisions of both the state and United States constitutions. The power to the commissioners of the land-office to grant lands under water was given expressly to promote the commerce of the state. (1 R. L. 293.) Under the act giving that power the grantor of the plaintiff accepted a patent, and the plaintiff relying upon the implied covenant contained in the grant from the state, that he should enjoy a free and uninterrupted navigation from any wharf he might erect on it, filled in the water lot and erected a wharf. The grant was a contract, and

though executed, still a contract, the obligation of which could not be impaired, as it is if effect be given to the act of 1823 under which the pier was erected. The grant remains, but the beneficial use is destroyed. The profits of land are considered as land. (Co. Litt. 5.) The grant of a wharf, necessarily includes the right of a free navigation to and from the same. (6 Mass. R. 332.) The grant by a state of land under water to promote commerce could only be for the erection of wharves, store-houses or other erections connected with commercial operations, and the main object of both parties cannot be defeated by the grantor; a state can no more than an individual interfere with a contract to which it is a party. (8 Wheaton, 1. 2 Kent's Com. 276.) The act of 1823 is most palpably an infringement upon the rights of the plaintiff; it imposes double wharfage upon vessels entering the basin, whilst it allows the proprietors of the pier to ask only single wharfage ; it makes the wharf of the plaintiff part of one side of a canal, and yet gives the whole of the toll to the proprietors of the other side, and it grants a franchise to strangers which the original act on the subject of these water grants not only contemplated, but expressly directed should be given only to the proprietors of the adjacent lands. To shew the unconstitutionality of the act the counsel cited 17 Johns. R. 195 ; 2 Johns. Ch. R. 162, 463 ; 6 Cranch, 136 ; 2 Dallas, 308 ; 7 Cranch, 164 ; 4 Wheaton, 518, 656 ; 9 Cranch, 43 ; 2 Gall. 105.

Although the defendants he considered public officers, they are not protected from an action. Every public officer acts at his peril. (3 Stark. 1448. 6 T. R. 443.) At all events, the plaintiff was entitled to recover for the damage sustained by him in consequence of the erection of the *tempo-rary* bridges ; they were convenient to the proprietors, reduced the expense of constructing the work, but not absolutely necessary to carry into effect the object contemplated. The very saving to the proprietors gives the plaintiff an equitable claim.

In the opinion delivered in the supreme court, the statute of 1823 was adjudged to be constitutional, and that the acts complained of were authorized; but if otherwise, they were

considered as *common nuisances*, and not the subject of a private action. This last proposition was fully discussed by the counsel, and the cases cited in the opinion examined and commented upon, particularly the case of *Iveson* v. *Moore*, (Ld. Raym. 486, and 12 Mod. 263.) He cited Willes' R. 74 n; Ld. Raym. 490, 491, 494; 3 Ridgway's Parl. R. 267, 283, 316, 324; 1 Halstead's R. 1; 7 Cowen, 611; 6 id. 518; 9 Co. 58; 2 Cro. 382; 1 Keble, 847; 8 T. R. 131; 3 Stark. 992; 4 Esp. R. 69; 3 Campb. 82; 8 East, 4.

*H. Bleecker & B. F. Butler*, for defendants in error. The replication is bad for *departure in pleading*. In the declaration, the infringement of common law rights is complained of; in the replication, statute rights are set up: this is not admissible. (1 Chitty, 619, 623. Co. Litt. 304 a. Com. Dig. tit. Pleader, F. 8, 11. 3 Reeve's Hist. 438. 2 Saund. 84 a. n. 1. 14 Johns. R. 132.) The adding of new and substantive facts in the replication, such as sinking the pier and diverting the water, is not allowable. (2 Saund. 846, n. 1. 1 Chitty, 602, 612.) There is no averment that the plaintiff was seised of the soil under the pier, nor that it was granted to the proprietors of the pier. Without a former suit and recovery, an action will not lie for a *continuance* of a nuisance. (Ld. Raym. 713, 317. 10 Mass. R. 72. Cro. Jac. 231. Yelv. 142, 3. Dyer, 319. Comyn's Dig. tit. Action on the Case, A. 422, B. 429.)

The act of 1823 authorizing the construction of the Albany basin does not violate the constitution of this state. No property of the plaintiff is *taken* for the construction of the work. Property here must receive its ordinary and natural interpretation, the thing itself and not the profits resulting from it; otherwise, on the laying out and construction of a turnpike road, an innkeeper, from whose house the travel is diverted, might complain of an infraction of a constitutional right. Nor is the constitution of the United States violated; the act of 1823 impaired not the obligation of any contract entered into by the state. The grant to Quackenboss, under whom the plaintiff claims, was gratuitous; no condition was imposed. It gave him the exclusive right to the property granted, and it may be conceded for purposes connected with

navigation; but no exclusive right in that respect was grant-

ed to him, nor were the state, by the grant to him, limited in
the exercise of their rights of sovereignty : they might make
similar grants to other proprietors of lands adjoining the plain-
tiff, or they might make a grant to others who held no lands
adjacent. Had there been an island in the river opposite the
lot of the plaintiff, they might have granted the land under
water to whomsoever they chose, or they might, as they have
done, authorized the creation of an artificial island. The
provision in the act of 1801, limiting the grant of water lots
to the owners of adjacent lands, was directory only to the
commissioners of the land office, and does not interfere with
the exercise of acts of sovereignty by the state through its
constitutional agent, the legislature, who have not only the
power, but whose duty it is to improve all natural advanta-
ges to the advancement of the interests and prosperity of the
state. Upon the same principle upon which the grant to
Quackenboss was authorized, the grant to the pier company
was made. The latter grant did not annul the former; it
did not destroy the rights of the plaintiff; it simply modified
them ; and though it gave to others a participation in advan-
tages before enjoyed by the plaintiff, he cannot for that cause
complain, as no exclusive right to those advantages belonged
to him. The inconvenience and injury sustained by the
plaintiff is inseperable from all public improvements, and to
induce to a public improvement the grant to the pier com-
pany was made, which has been realized.

The defendants are not liable to an action, acting as pub-
lic officers within the scope of the authority entrusted to
them, and not being chargeable with malice or oppression in
the execution of the duties of their office. (2 Johns. R. 286.
2 Barn. & Cress. 703. 4 id. 269. 4 T. R. 794. 3 Wils. 461.
12 Mass. R. 466. 6 Taunton, 29. 20 Johns. R. 739, 745.)

The right to erect *temporary* bridges for the more conve-
nient construction of the pier was necessarily implied in the
powers granted. All necessary means to effect a legitimate
object may be resorted to. (4 Wheaton, 413.) The incon-
venience to the plaintiff was unavoidable, and must be sub-

mitted to as in cases of paving streets, laying sewers, &c. The plaintiff may have sustained damage, but it was *damnum absque injuria*, for which an action does not lie. Besides it was temporary.

If the act of 1823 is unconstitutional, and the doings of the defendants under it unauthorized, the *pier*, &c. are *common nuisances*, and the plaintiff is not entitled to his private action unless he shews a special injury peculiar to himself, which he has not done. Others owning property similarly situated suffered equal inconvenience. (3 Black. Comm. 219, 20. Bacon's Abr. tit. Nuisance, D. 4 Maule & Sel. 101. 11 East, 60. 2 Mass. R. 492. 2 Pick. 601. 19 Johns. R. 181. 7 Cowen, 609. Russell on Crimes, 485. Hawkins, book 1, ch. 76, §1. 2 Chitty's Cr. L. 633, n. 2 Starkie's Ev. 510.)

*A. Van Vechten,* in reply, insisted that the act of 1801, under which the grant to Quackenboss was made, *admitted* the right of the owners of the adjacent lands to grants of lands under water; which admission, he contended, excluded the power of the state to convey to others. One grantee cannot complain of a grant to another similarly situated with himself, each being the owner of lands adjacent to water lots, because their rights are equal; but he has just cause of complaint when privileges are granted to strangers interfering with rights before ceded to him, notwithstanding that the grant to him originally was gratuitous; for though originally it cost him nothing, having obtained it for the purpose of promoting commerce, by facilitating its operations by means of wharfs, &c. and having expended money in the erection of such wharfs, he has a right to insist upon the implied contract, that no act should be subsequently done by the government to annul the grant made to him.

The act authorizing the construction of the pier is a destruction, not a modification of the rights of the plaintiff. His wharf before the erection of a pier was used as a lumber yard, now the lumber brought to the city is piled on the pier; vessels loaded with lumber and hay cannot pass through the lock into the river; double dockage is imposed

upon vessels entering the basin, whilst the proprietors of the pier are permitted to charge single dockage only; and the free and uninterrupted communication with the river is destroyed, and all done to benefit a company of individuals, and not in the prosecution of a public work for public use.

ALBANY,
Dec. 1829.

Lansing
v.
Smith.

But allowing the work to have been for public use, and that the plaintiff was bound to yield his private rights, he could not be required to make such surrender without just compensation. The provision in the constitution guaranteeing compensation was inserted for the protection of private rights, without reference to the species of property taken for public use. The rights of the plaintiff have been invaded, and no compensation made or provision existing for such compensation. It is not denied that the legislature had the power to authorize the erection of a pier, if in their opinion the public interests demanded it, but in such case the constitution requires that provision shall be made for all injuries to private rights, which in the present instance has not been done.

As to the *temporary* bridges the act considered constitutional, it is not denied that they might be erected, if the most convenient means of effecting the object; but if so, the defendants are responsible for the damages sustained by the plaintiff.

Although the pier and other works complained of should be considered a *common nuisance*, and that a number of others as well as the plaintiff have sustained damage, the plaintiff is not therefore deprived of his action; he and every other who has sustained injury peculiar to himself is entitled to his action, as an indictment would afford him no remedy for his private wrong.

The following opinions were delivered:

By the CHANCELLOR. Some techical objections are made to the replication of the plaintiff which I do not deem it material to consider; the same question which was intended to be raised by the replication arises on the bill of exceptions. The second count is broad enough to cover the erection of

the draw bridge immediately south of the plaintiff's wharf, and is not met by the special pleas; but as in an action on the case it is not necessary to plead the defence specially, the whole defence may be gone into on the general issue. I shall therefore only examine the question whether the replication is good in substance.

The plaintiff claims to recover in this case on two distinct grounds. The first is that the act of 1823, authorizing the construction of the Albany basin, was unconstitutional so far as it authorized the defendants to do any acts injurious to his property. The other relates to their conduct in the erection of the temporary bridges; which the plaintiff insists was not within the powers conferred by the act. The first question arises both under the special pleadings and the bill of exceptions; the latter arises under the general issue only. The first ground, the main question in this cause, I shall now proceed to consider.

In deciding upon the constitutionality of the act of 1823, it will be necessary to ascertain what were the rights of the plaintiff as against the state, previous to the passage of that act. The people of this state, as the successors of its former sovereign, are entitled to all the rights which formerly belonged to the king by his prerogative. Through the medium of their legislature they may exercise all the powers which previous to the revolution could have been exercised either by the king alone, or by him in conjunction with his parliament; subject only to those restrictions which have been imposed by the constitution of this state or of the United States.

By the common law, the king as *parens patria* owned the soil under all the waters of all navigable rivers or arms of the sea where the tide regularly ebbs and flows, including the shore or bank to high water mark. (Constable's case, 5 Coke's R. 106. Davies' R. 152, 153. *Rex* v. *Smith*, Doug. R. 425.) He held these rights, not for his own benefit, but for the benefit of his subjects at large; who were entitled to the free use of the sea, and all tide waters, for the purposes of navigation, fishing, &c. subject to such regulations and restrictions as the crown or the parliament might prescribe.

By *magna charta*, and many subsequent statutes, the powers of the king are limited, and he cannot now deprive his subjects of these rights by granting the public navigable waters to individuals. But there can be no doubt of the right of parliament in England, or the legislature of this state, to make such grants, when they do not interfere with the vested rights of particular individuals. The right to navigate the public waters of the state and to fish therein, and the right to use the public highways, are all *public* rights belonging to the people at large. They are not the *private* unalienable rights of each individual. Hence the legislature as the representatives of the public may restrict and regulate the exercise of those rights in such manner as may be deemed most beneficial to the public at large; provided they do not interfere with vested rights which have been granted to individuals.

What then were the rights of the owner of the land adjacent to this wharf before the patent from the commissioners of the land office, and what new rights did he acquire under that patent? Before the patent was granted, the bank of the Hudson between high and low water mark belonged to the people, and he had no better right to the use of it than any other person. If he built on it, or erected a wharf there, it would be a purpresture which the legislature might direct to be demolished, or to be seized for the use of the public. (Harg. Law Tr. 85.) Or the legislature might authorize erections in front thereof, as in the case of Smith's wharf on the Thames. (*Rex* v. *Smith*, Doug. 425.) If it was calculated in any manner to impede or injure the navigation of the river, it might also be abated as a common nuisance. (*The Attorney General* v. *Johnson*, 2 Wils. Ch. R. 87.) So long as the constituted authorities of the state did not think proper to interfere, persons navigating the river might come to the wharf, subject to the payment of such wharfage as the state allowed the owner to take. But even the taking of a common wharfage, or toll at a ferry, is a franchise, subject to the control and regulation of the legislature, and cannot be lawfully exercised without their permission. (Hale's de Jure Maris, 6. Morgan's case, De Portibus Maris, 51. 4

Com. Dig. tit. Piscary, B. *Vanderbilt* v. *Adams*, 7 Cowen's R. 349. *Wilson* v. *The Black Bird Creek Marsh Co.* 2 Peters' R. 245.) It is evident from what has been said that the plaintiff had no vested rights previous to his patent which could deprive the legislature of the power to construct this basin. It remains to be seen whether he acquired any such rights under the patent. If a legislative grant or a grant by authority of the government is made to any individual, it is in the nature of a contract executed. And the constitution of the United States has prohibited the state legislatures from passing any law impairing the obligation of contracts. The state constitution has also provided that private property shall not be taken for public uses without just compensation.

There is nothing in the act under which the patent in this case was granted which gives to the owner of the adjacent lands the exclusive right to a water grant so as to deprive the legislature of the power of granting it to another. The object of the act was to authorize the commissioners of the land office, in their discretion, to make such grants in certain cases for the promotion of commerce. It was to prevent the necessity of frequent applications to the legislature for that purpose. And the prohibition against granting to any others than the owners of the adjacent land was a proper and salutary limitation of the power given to the commissioners. It never could have been intended as a restriction upon the power of the legislature. The original act from which the revision of 1801 was copied, (1 Green. ed. 284,) shows most clearly that it was intended to be a restrictive on the commissioners only. The words of the proviso there are " that no such grant shall be made *in pursuance of this act*, to any person whatever other than the proprietor of the adjacent lands." The words " in pursuance of this act" are left out in the subsequent revisions of the laws, but the construction of the act was not intended to be altered thereby. The patent under which the plaintiff claims, is a simple grant of the land under the water by metes and bounds. And in all grants which are in derogation of the rights of the public nothing is to be taken by implication. In the case of *The Royal Fishery of Banne*, (Davies' R. 157,) where the king

granted all the territory adjoining the river, and all fisheries within the territory, except three fourths of the fishery of Banne, it was held that one fourth of the Banne fishery did not pass by implication. So in the case of *Brinch* v. *Richtmyer*, (14 John. R. 255,) the supreme court decided that a grant of the Green Flats, in the Hudson, did not carry with it the exclusive right of fishery; although, in fact, the flats did not appear to be useful for any other purpose. Whether the legisla ure could grant the right to any other person to build a wharf in front of the plaintiff's so as to destroy his entirely is a question which it is not necessary now to discuss. The true question is whether, by authorizing the commissioners of the land office to make the grant to the plaintiff, they have precluded themselves from making a great public improvement for the benefit of commerce. I can see nothing in the constitution of this state or of the United States which can give such an effect to the grant. On the contrary, the act itself, under which the patent issued, authorized the grant to be made only where it was deemed beneficial to commerce; and it would be directly in opposition to the spirit of the law to give a construction to this grant which would deprive the state of the power to regulate the wharves, ports, harbors, and navigable waters within its boundaries for the benefit of commerce. If that patent is to be considered a grant of a right to erect a wharf, there is an implied reservation of the right of the legislature to regulate the use of that wharf and the waters adjacent, and to fix and determine the amount of wharfage. By the common law, such a reservation was implied in every grant of that description. The basin was in fact constructed for the benefit of the public, for the safety and protection of boats navigating the canal, although individuals have acquired rights under the law in consequence of their expenditures for the public benefit. The wharf of the plaintiff, as well as the adjacent lot, might have been more valuable if the canal had terminated where it now does, and the basin had not been made; but whether it would have terminated there if the act of 1823 had not been passed, is a question which cannot now be determined. The plaintiff still retains the privilege of a wharfinger, although the nature

of the business is materially changed by the making of the canal and the construction of the basin. His private property has not been taken for the public use, and there has been no violation of any contract on the part of the state, either expressed or implied, in the patent. I am satisfied the act of 1823 was valid and constitutional, and that the loss of the plaintiff, if any has been sustained by him in consequence of the building of the pier and lock, or the construction of the basin, is *damnum absque injuria*, for which no action lies against the defendants.

As to the alleged injury in consequence of the erection of the temporary bridges, I have arrived at the conclusion that there was no evidence in this case which could have authorized the jury to find the defendants guilty of erecting those bridges. The declaration is not properly framed to charge the defendants, as public officers, for neglect of duty in permitting the contractors employed in making the pier to construct the temporary bridges in an improper manner. The defendants are charged with the erection of these temporary bridges, without reference to their character as commissioners. To sustain an action against the defendants on these pleadings, the plaintiff should have proved that they erected the bridges or caused or procured them to be erected; but the testimony shews they contracted with individuals to fill in the wharf at a certain price per cubic yard, without reference to the place from whence the clay or earth was to be procured for that purpose. The contractors undoubtedly contemplated obtaining it from the city by means of such bridges; but as I understand the testimony, they constructed the bridges at their own expense and for their own individual benefit, without any directions from the defendants. The only agency on the part of the defendants was the temporary loan of some of the timbers belonging to the pier, and some of them gave their opinions to the contractors as to the best mode of constructing these bridges. I do not think this was sufficient to charge them as parties in that transaction. There was no evidence of any specific injury to the plaintiff from the erection of the temporary bridges. Some injury must necessarily have been sustained by all the owners of

property on the west side of the basin during the erection of the pier, whether these bridges had been there or not; and it is doubtful whether any other mode of getting earth to the pier could have been devised, which in its effect would not have been more injurious to the wharf owners generally.

If the defendants had erected these temporary bridges, and were not authorized to do so, they might be indicted for a common nuisance. But the bridges might also be more injurious to some persons than to others. In such a case, if a person has sustained actual damage by the erection of the nuisance, whether direct or consequential, I am not prepared to say he cannot maintain an action against the wrong doer. If he sustains no damage but that which the law presumes every citizen to sustain, because it is a common nuisance, no action will lie. But the opinion I have formed on this point is, that every individual who receives actual damage from a nuisance may maintain a private suit for his own injury, although there may be many others in the same situation. The punishment of the wrong doer by a criminal prosecution will not compensate for the individual injury; and a party who has done a criminal act cannot defend himself against a private suit by alleging that he has injured many others in the same way, and that he will be ruined if he is compelled to make compensation to all.

But I think the whole ground of the plaintiff's suit in this case has failed, and that the judgment of the supreme court should be affirmed.

By Mr. Senator S. ALLEN. In taking a view of this case, the first thing which struck my mind was the inconsistency of the two acts of the legislature under which the parties in this cause severally claim.

By the act of 1801, the commissioners of the land office are prohibited from making water grants to any person whatever, other than the proprietor or proprietors of the adjacent lands. By the act of 1823, the commissioners of the land office are required, so soon as the mole or pier shall be finished, to grant to the defendants and their associates the land under the water of the Hudson river occupied by the mole

*Margin note: ALBANY, Dec. 1829. Lansing v. Smith.*

or pier. The first act, therefore, prohibits grants to any except those owning the land bounded by the river, while the second authorizes a grant to persons not owning the adjacent land, and in violation of the first grant, and to the injury of those who have been induced to take them out and expend their money in improving them.

The sole and only objects of the owners of the land bounded by the river in taking out their grants and in incurring the heavy expense of filling in the lots and building piers and wharves, is the profits to be derived from their use by the vessels and other water craft navigating the river. In the present instance the plaintiff is induced to purchase this privilege under the pledge of a public act, when, by another act the privilege is, in a great measure, taken from him and given to the defendants and their associates. If this can be considered just and proper, with the same measure of justice the defendants may be authorized to fill in the basin with earth and dispose of the land in town lots, and thus shut out the plaintiff from the use of the river altogether.

It is contended by the court below, that the whole act contemplates the basin and pier as a public work; I apprehend, however, this is not a fair conclusion from the provisions of the act in question. The money for the construction of the work was raised by the subscription of private individuals, and the state did not pay a cent towards it. The pier, when erected, was to be divided into lots of 40 feet in width and sold for the benefit of the subscribers to the work; and the same was sold, by which a considerable advance on the amount subscribed was realized. The canal commissioners are to charge toll on all boats, craft and lumber entering or leaving the basin from or to the canal, which toll is to be paid to the owners of the pier. For all vessels navigating the Hudson river and entering the basin, *double* wharfage is to be charged, the one half of which is to be paid to the owners of the pier lots, and for all vessels laying on the outward or easterly side of the pier in the Hudson river, the owners are to charge the usual wharfage or *half* the sum charged inside. The arrangement, by the way, of charging *double* wharfage inside and *single* wharfage outside, is one of the

evils of which the plaintiff has a right to complain, as it tends to prevent vessels from coming into the basin on account of the difference in the charge; takes from the plaintiff the control of his property as it respects the amount to be charged for its use, and in fact renders his wharf useless as a place for vessels to lay at.

The building of the pier and mole therefore is not a public work, but a mere matter of private interest and speculation; first, for the benefit of the subscribers to the expense of the erections, and second, to that of the holders of the pier lots. It is in no other view a public benefit or public work than is the erection of a mansion house, or any other improvement constructed for the pleasure, use, or profit of the owners. They are all more or less an advantage to the public, and in this sense public improvements.

It is said there is no foundation for the constitutional objections which have been raised to the act in question. To this I will only reply, that whatever may be the fact as to the constitutionality of the act, it is in my view, if the construction given to it by the court below be correct, a very unjust and oppressive act.

A citizen is induced to purchase, under the sanction of a solemn act of the state, a privilege which, from the usage of every civilized government where the rights of property are acknowledged, he had a right to believe was guaranteed to him by his deed, and that he would be protected in its enjoyment by the authority under which he held; but instead of that, we see the same authority passing an act in direct opposition to the act under which he was induced to purchase which deprives him of a right inseparable from his grant and gives it to another. His property is depreciated a moiety of its value by the acts of individuals who are the cause, and reap the benefit of the depreciation, and he is denied the right to call upon them for the damages he has sustained by their acts. If this is not the height of injustice I am unable to give it a designation. But, say the court below, the act of April, 1823, provides compensation to be made for the only direct injury which it contemplated as likely to accrue to the owners of the adjacent land. It was

supposed that those lands might be overflowed by the erection of the pier and lock, and therefore provision is made for the payment of such damage. I have but little doubt that the representations made to the legislature, and perhaps honestly entertained by those interested in the plan, was, that no other injury could accrue but the one named, for the act evidently contemplates a greater depth of water in the basin than the usual level of the river, otherwise why provide for the construction of a sloop lock at the southern extremity of the basin? One of the witnesses states if the gates of the lock were closed it would raise the water in the basin at the plaintiff's dock from two to three and a half feet; but what is the fact? It is believed to be, that the lock is never closed, and the water, therefore, has not overflowed the land; and the payment of damage and the expense of attending the sloop lock, provided for by the act, is saved to the proprietors, an additional circumstance shewing the character of the work, that it is not a public, but private undertaking.

In every act of the legislature authorizing improvements by opening, closing and straightening streets and roads, constructing canals or aqueducts, or any other operation of the kind, special provision is made for the protection of private rights; and had the legislature of 1823 been aware of the injury that has resulted to individuals by the construction of this pier and basin, they never I am persuaded, would have passed the act without providing that the damages as well as the benefits, if any, should be assessed and paid for.

By the charter of the city of New-York, the corporation are vested with the right of soil under water, 400 feet from low water mark, extending from two to three miles along the shores of the Hudson and East rivers; and by an act of the legislature, passed the 3d of April, 1807, this grant was extended four miles further up the Hudson, and two miles further up the East river; at the same time providing that the proprietors of the adjacent lands shall always have the pre-emptive right, in all grants made by the corporation, of any lands under water granted by the state. The corporation stands in the same relation in respect to these water grants in New-York, that the commissioners of the land of-

fice do in respect to those at Albany; and numerous grants of the soil under water have been made by them in pursuance of these provisions. The grantees have incurred heavy expense in filling them in, and in making South and West streets, and in sinking and extending the docks and piers for the accommodation of vessels, and in order that a remuneration might be received for the money expended in making the improvement. Now, the grant made to the plaintiff is of the same tenor and effect as that made to the corporation of the city of New-York, both emanating from the same source, viz. the commissioners of the land office, by the authority of a legislative act. Suppose the legislature should pass an act authorizing a number of individuals in the city of New-York to build a mole or pier in front of a portion of the piers and docks in the Hudson river, which should enclose several of them; and although this pier did not obstruct the navigation of the river, and gave accommodation for vessels to load and unload at it, nevertheless materially injured the property of the grantees of the land under water, by depreciating its annual value more than one half; ought this to be viewed as the court below views the act of 1823, as no violation of rights, but a mere regulation of the use of them? I think not. The privilege given these pier and basin proprietors by the act of the 5th of April, 1823, must be taken and construed as not interfering with, or including any of the rights and immunities of others, but reserving to the prior grantees all their franchises, privileges, perquisites and rights; and in this view, according to my humble opinion, it ought to have been considered by the court below.

One of the principles upon which that court decided the question when before them was, that the erections complained of, if unconstitutional, constituted a *public nuisance;* that the plaintiff's case was not distinguishable from that of every other owner of a wharf within the basin, and if the injury operated equally on many individuals, though a *very small* portion of the *community*, it was not a special damage to each. None of the other owners are complainants, and for aught we know, they may have been remunerated for their losses, or are benefitted by the project; at any rate, the question before us

is the injury done the plaintiff, and not that which may have no existence. And upon the rule contended for, that if only a small portion of the community are injured it is not a special damage, the number may be reduced to two or three persons, and under such a rule every proper avenue to justice may be closed.

Judge Blackstone says, "Nuisances are of two kinds, public or common nuisances, which affect *the public* and are an annoyance to *all* the king's subjects, for which reason we must refer them to the class of public wrongs or crimes and misdemeanors. Private nuisances may be defined, any thing done to the hurt or annoyance of the lands, tenements, or hereditaments of another." Surely, the nuisance complained of cannot be brought under the designation of public nuisance, as it does not affect the public, or *all* the citizens, but only such are affected whose property is injured, and they must be very few, and perhaps the plaintiff stands alone. It must therefore be no other than a private nuisance, as it is an act done to the annoyance and hurt of the lands of another.

Hawkins says, that "a common nuisance may be defined to be an offence against the public, either by doing a thing which tends to the annoyance of *all* the king's subjects, or by neglecting to do a thing which the *common good* requires. But annoyances to the interests of particular persons are not punishable by a public prosecution as common nuisances, but are left to be redressed by the private actions of the parties aggrieved by them; and from hence it clearly follows that no indictment for a nuisance can be good, which lays it to the damage of private persons only."

The distinction, then, between public and private nuisances is plain and palpable; the first being an injury done which affects the *whole community*, and therefore not actionable; the second, an injury to the property, privileges or health of individuals of that community, and is actionable. It appears to me, therefore, that the case of the plaintiff comes clearly within the definition of a private wrong, and was actionable accordingly.

Most of the cases cited by the court below as authority for their decision, as it appears to me, are not applicable to the

case of the plaintiff in this cause. The cases of obstructing the highway or public road, bridge or ferry, are common injuries, in which no citizen has a sole interest in the thing obstructed or injured, and therefore are not analogous to the present case.

The case of *Williams* v. *Jones*, (5 Co. 72,) was for omitting to celebrate divine service in a parish church. Here there was no injury of private property, and yet it was admitted that a remedy was to be had in the spiritual court, and consequently not by indictment.

Robert Mary's case, (9 Co. 112,) appears to be decided for the plaintiff upon the principle that it did not judicially appear that any other was injured but the plaintiff; and we have a right to conclude, until others complain, that the plaintiff in this case is the only injured party.

The case of *Hart* v. *Basset*, (T. Jones, 156,) was for preventing the plaintiff from going to his barn. By reason of the obstruction, he was forced to carry articles round about, with additional labor to his cattle and expense to himself, and it was held to be a particular damage. This certainly is the case of the plaintiff. Vessels with lumber or hay cannot pass through the lock and come to his wharf, and therefore it is depreciated in value to half what it was before the building of the pier and basin.

The case of *Morley* v. *Pragnell*, (Cro. Car. 500,) was one of nuisance for maintaining a tallow furnace which infected the atmosphere, and was therefore no way similar to the present.

The case of *Iveson* v. *Moore*, (Ld. Raym. 486, and 12 Mod. 263,) was for damages sustained by the plaintiff in having the passage of his colliery obstructed by the defendant, who was owner of another colliery, by which the benefits and profits of the plaintiff's colliery were lessened. This, it appears to me, is not unlike the case of the plaintiff in error, who, by the obstruction in the way to his wharf by the owners of another wharf, is losing the benefits and profits of his property. The judgment in this case was for the plaintiff.

The case of *Rose* v. *Mills*, (4 Maule & Selwyn, 101,) was the obstruction of a navagable stream, so that the plaintiff

could not pass with his boat and goods. This was held to be a particular damage, but not more so, to my view, than the case of the plaintiff in this cause, he being deprived of the beneficial use of his property by the obstructions of the lock and bridges.

The case of *Hughes* v. *Hiser*, (1 Binney, 463,) was the obstruction of a stream by a dam, which prevented the plaintiff from floating a raft of timber to market, and the judgment was for the plaintiff. The court below seems to think, however, if Hughes had declared that the injury arose from owning a valuable lot of timber above the dam, which he intended to raft to market, but did not in consequence of the erection of the dam, that he could not have recovered, as the injury would have been in *contemplation*. I am unable to understand the purport of these nice distinctions; nor can I see, if this *contemplation* is intended to be applied to the present case, the force of the observation, for the damage sustained by the plaintiff is present, palpable and incontrovertible, and not in contemplation.

The court appears to suppose, also, if the basin were to be the means of contagion to the neighborhood, it would be an occurrence similar in principle to the present case; but surely a case of contagion, which may spread to the greater part of the city, and consequently affect the public generally, cannot be likened to a private injury to the property of one or to a number of individuals. If it be law that if more than one citizen shall be injured in their property or person, no redress can be had from the wrong doer except by the tedious and uncertain remedy of indictment, it is time, in my opinion, it should be altered.

The books tell us that in all cases where a man has a temporal loss or damage by the wrong of another, he may have an action upon the case to be repaired in damages. (1 Comyn's Dig. 272.) An action on the case lies against him who erects a nuisance, and against him who continues a nuisance erected by another. Thus the occupant, as well as owner of a thing, erected to the nuisance of another, is liable to an action on the case, which may be brought by the suc-

cessive owners and occupants of the place where the injury is sustained. (Bigelow's Dig. 440.)

Having duly considered the subject, and examined such authorities as have come within my reach, I am brought to the conclusion that the judgment of the court below ought to be reversed.

On the final question, shall the judgment of the supreme court be affirmed or reversed? the members of the court ranged themselves as follows:

*For affirmance*—The CHANCELLOR and Senators E. B. ALLEN, BENTON, ENOS, HAGER, HUBBARD, MATHER, MAYNARD, E'LEAN, OLIVER, REXFORD, SMITH, STEBBINS and WATERMAN.

*For reversal*—S. ALLEN, BOUGHTON, M'MARTIN, SANFORD, SCHENCK, VIELE and WARREN.

Whereupon the judgment of the supreme court was affirmed.