In the Matter of the Application of ALUMINUM COMPANY OF AMERICA, Petitioner, against MILO R. MALTBIE and Others, Constituting the Public Service Commission of the State of New York; the PUBLIC SERVICE COMMISSION OF THE STATE OF YORK; and THE NIAGARA FALLS POWER COMPANY, Respondents, for an Order Pursuant to Article 78 of the Civil Practice Act.

(Consolidated Proceeding — Case No. 9186.)*

Third Department, March 15, 1940.

*Hughes, Richards, Hubbard & Ewing* [*Charles E. Hughes, Jr.,* of counsel; *Augustus L. Richards, Harold L. Smith* and *Rowland Stebbins, Jr.,* with him on the brief], for the petitioner.

* Motion to amend petition was granted on January 24, 1940. (See 258 App. Div. 1019.)— [REP.

*Gay H. Brown, General Counsel* [*Laurence J. Olmstead, Sherman C. Ward* and *Martin V. Callagy* with him on the brief], for the respondent Public Service Commission and the individual members thereof, respondents.

*LeBoeuf, Machold & Lamb* [*Randall J. LeBoeuf, Jr.*, of counsel; *Warren Tubbs* and *Chauncey P. Williams, Jr.*, with him on the brief], for the respondent The Niagara Falls Power Company, *amicus curiæ.*

SCHENCK, J. This proceeding was instituted under article 78 of the Civil Practice Act to review a determination of the Public Service Commission which resulted in an order directing The Niagara Falls Power Company to file a schedule establishing rates to be charged for mechanical power sold by it to the Aluminum Company of America. The power in question is generated at the power company's turbines from the flow of water in a canal owned by the power company. The power is then transmitted by shafts to electric generators owned by the aluminum company, where it is converted into electricity for use in the aluminum company's factory.

The question involved herein is, accordingly, whether or not the Public Service Commission had authority to compel the power company to maintain a rate schedule covering charges for the power sold to the aluminum company. This proceeding was instituted by the aluminum company, the power company having joined in the argument against the contentions of the Public Service Commission as *amicus curiæ.*

The Commission in its opinion held that it had jurisdiction to grant the order under review pursuant to section 621 of the Conservation Law. This theory is based upon the provisions of section 621, which give the Commission authority to fix rates charged for "power generated * * * by the use of water in which the State has a proprietary right or interest," the right to fix which rates being expressly reserved to the State of New York in every license for the development and sale of power granted under article XIV of the Conservation Law. Section 615 defines the persons to whom and the purposes for which the licenses are to be issued. This section, likewise, requires licenses to be issued giving full State regulation of and jurisdiction over power developed from waters "in which the State has a proprietary right or interest." The Commission has, therefore, taken the position that the power company is actually only a licensee as far as its use of the waters of the Niagara river are concerned, that the State has a proprietary interest in the particular waters used to develop the power sold to the aluminum company, and, finally, that all contracts between the power company and the aluminum company for the sale of power are subject to abrogation by the Commission.

In analyzing these contentions it is necessary to take into consideration the history of the relationship between the power company and the aluminum company. Mechanical power is supplied to the aluminum company pursuant to certain provisions in five leases, one of which was dated 1895, two 1899, one 1905, and one 1922. The later leases, in substance, extend the expiration dates of the earlier ones. The essence of the contractual relations between the power company and the aluminum company, accordingly, dates back from the last part of the nineteenth century. When the leases were first entered upon between the predecessors of the two corporations the canal from which the power in question is developed was owned by the predecessors of the power company, pursuant to chapter 477 of the Laws of 1893 and chapter 968 of the Laws of 1896. The first of these chapters authorized The Niagara Falls Power Company to sell and furnish the waters of the Niagara river to any public body or private person. The second limited the use of the waters to the amount which could be carried in a canal 100 feet wide and 14 feet deep, provided this diversion did not affect the practical navigability of the Niagara river. Subsequently, in 1918, chapters 596 and 597 of the Laws of that year provided that for all water used over and above the rate of 15,100 cubic feet per second in the canal the power company would have to pay rent. These chapters, accordingly, recognized the basic exclusive right of the power company to the particular waters in the canal but limited the amount which could be used without the paying of rental to the State. Accordingly, prior to the enactment of article XIV of the Conservation Law (including sections 615 and 621) in 1921, the contracts between the power company and the aluminum company were in full force and effect and were based upon exclusive water rights granted the power company by the State of New York, which rights were recognized even when a restriction requiring payment of rent was imposed in 1918.

This viewpoint, furthermore, has been adopted by the Court of Appeals and is clearly set forth in *Matter of Niagara Falls Power Co.* v. *Water Power and Control Comm.*, 267 N. Y. 265). That case denied the power company's right to draw 20,000 cubic feet per second but affirmed its right to 15,100 cubic feet per second. It is true, as contended by the Commission herein, that the decision went against the power company. It went against the power company, however, only to the extent of fixing a rental rate for the extra water used. There was no holding that the State had a proprietary interest in the particular waters used by the power company in its canal. To the contrary, the rights of the company to use the waters and make contracts relative thereto were upheld.

The Public Service Commission, in the case at hand, is in the position of endeavoring to compel the power company to breach its contract with the aluminum company under authority of a law enacted many years after the contract had been entered upon, and which law, furthermore, limits its authority to waters in which the State has a proprietary interest, a situation which does not exist here. Upon the first of these points abrogation of the existing contract would have been unconstitutional even had the Legislature desired to so abrogate it, and there is nothing in the pertinent sections of the Conservation Law that indicates that it so desired. Such abrogation would clearly have violated the Fourteenth Amendment to the Constitution of the United States. It is no argument that the manner in which the power company has associated the rest of its business with the public interest brings the aluminum company's contract into the "public" category and subject to rate regulation. The contract in question is still "private" regardless of the other interests of the power company. (See *Miller* v. *Clary*, 210 N. Y. 127.) Accordingly, the authority under which the Public Service Commission seeks to abrogate the contract would be invalid even if it were intended to cover a situation such as exists here.

There is also, of course, the point that, regardless of existing contracts, article XIV of the Conservation Law does not apply here because the State has no proprietary interest in the waters in the power company's canal which are used to generate the power in question. Argument upon this point is disposed of by the case of *International Paper Co.* v. *United States* (282 U. S. 399), in which it was squarely held that the waters in question were exclusively the property of the power company and that the company owned the water rights under consideration to the fullest extent that the laws of New York could make it the owner. In that case Mr. Justice HOLMES delivered the opinion of the court and said (at p. 404): " The Niagara Falls Power Company by private grant to it, Letters Patent from the State of New York and acts of the Legislature of that State, was the owner so far as the law of New York could make it owner of land and water rights on the American side of the River above the Falls. Included in them was a power canal through which the Power Company was authorized to divert 10,000 cubic feet per second, at the time of the alleged taking. From this canal the petitioner, the International Paper Company, was entitled, by conveyance and lease, to draw and was drawing 730 cubic feet per second — a right that by the law of New York was a corporeal hereditament and real estate."

While it has been determined that the power company has no right to take water in excess of 15,100 cubic feet per second without paying an equitable rental for the excess (*Matter of Niagara Falls Power Co.* v. *Water Power and Control Comm.*, *supra*), that amount which it may take under its grants is far in excess of the amount which it has contracted to furnish the aluminum company.

The order of the Public Service Commission not only violates the Constitution but it is apparent that the authority (*e. g.*, Conservation Law, § 621) under which it is purported to grant the order, does not apply to the instant situation. Other bases of authority, including subdivision 14 of section 66 of the Public Service Law and chapter 596 of the Laws of 1918, were urged in the argument herein. They were not, however, relied upon by the Commission in its order, and they were quite properly disregarded there as being without merit. The sole transaction involved herein is the sale of mechanical power by one private corporation to another pursuant to contracts of many years' standing. There is nothing in the laws of the State of New York to confer rate-fixing authority for this sale of power upon the Public Service Commission.

The orders of the Public Service Commission of October 18, 1938, and May 23, 1939, should be annulled, with fifty dollars costs.

CRAPSER and FOSTER, JJ., concur; HILL, P. J., dissents, in an opinion, and votes to annul that portion of the order which requires The Niagara Falls Power Company to fix the rate and to remit the proceeding to the Public Service Commission for the fixing of a rate by that body; BLISS, J., dissents and votes to confirm the determination of the Public Service Commission.

HILL, P. J. (dissenting). The Public Service Commission, purporting to act under the Conservation Law (§ 621) and the Public Service Law (§ 66, subd. 14), has directed The Niagara Falls Power Company to file a classification containing a schedule of rates covering the charges made for power to be furnished to Aluminum Company of America. The former company will be referred to as " Power " and the latter as " Aluminum." In Power's brief it is recited that Aluminum has made it a party to this proceeding under article 78 of the Civil Practice Act for a review of the above order, but that it did not file an answer and regards its status as in the nature of *amicus curiæ*.

It is the contention of Aluminum that it purchases mechanical power developed by falling water in which the State has no proprietary interest and, therefore, the purchase is not subject to the Conservation Law (§ 621); that the power is delivered under

contracts with Power and as an appurtenant to about four acres of leased land upon which Aluminum has erected its manufacturing plant on the brink of the high bank below Niagara Falls, and that the leases are not contracts under which electric energy is purchased but are grants of land and appurtenant water power and are not within the jurisdiction of the Commission under the Public Service Law (§ 66). The terms of the contract between Power and Aluminum are contained in five instruments in form leases, one made in 1895, two in 1899, one in 1905, and the last in 1922. The 1905 and 1922 contracts expire in 1967 and the first of these modifies and changes the expiration dates of the earlier ones from 1921 to 1967. Some of the contracts enumerated were entered into between predecessors of Power and the predecessor of Aluminum, but at this time the corporations named are the contracting parties.

During the first quarter of the last century the State of New York, by letters patent and for a valuable consideration, granted lands along the American side above the falls of the Niagara river to Power's predecessors in title. The descendants of these patentees and grantees in 1852 conveyed to one Brant lands adjacent to the river above the falls upon which Port Day, the intake now used, is located, and a strip of land where the canal has been dug that conducts water from the river to the high bank adjacent to the gorge below the falls; also lands of considerable extent along the edge of the high bank where Aluminum's plant and other structures now stand. The State of New York, in 1886 and 1893, granted land in the river bed adjacent to Port Day, the title to which is now held by Power. From Port Day waters flow along the canal built in 1853 and through a tunnel constructed in 1923 into basins and forebays on the brink of the bank about 200 feet above the level of the river in the gorge. Power is generated by means of penstocks connecting the water storage at the top of the bank with turbine water wheels at the bottom, substantially at level of the river. There are now twenty-one turbines all housed on the east side of Power's building located at the water's edge and designated Stations 3-A, 3-B and 3-C. A shaft from each extends through a concrete wall into the westerly portion of the building where each shaft is attached to two electric generators. The portion of the building designated Station 3-A is the most northerly. It contains fifteen turbines, the property of Power, and each is coupled to two generators. The shafts of five of the most northerly of the turbines, located in Station 3-A, connect with ten generators, the property of Aluminum. These develop electric energy which is conducted by bus bars through Power's tunnel to Aluminum's

plant at the top of the bank. There it is used for power and in the reduction and fusion of metals and alloys. Power sells electric energy from the generators which it owns and which are located in other portions of the three stations to various customers other than Aluminum. The present plant and equipment of these parties which has been described briefly differs markedly, of course, from that used when the first agreement was made in 1895 and which provided: " Said party of the first part [Power's predecessor] has agreed to and hereby does lease unto the said second party [Aluminum's predecessor] and said second party has agreed to and hereby does take from said first party twenty thousand square feet of said first party's land located on top of the high bank of the Niagara River, * * *." The term was twenty-five years and the rental two dollars and fifty cents per foot frontage on a railroad switch that ran through the land. Quoting further from the contract: " And it is further agreed that said party of the first part will proceed with all reasonable dispatch, by ordinary methods, to prepare plans and put in and erect upon the lower bank of said Niagara River such flumes, penstocks, pits, turbine wheels and other appliances constituting a water-power plant, together with buildings for the accommodation of the same with which to furnish to said second party mechanical power for at least three thousand horse-power in electrical power, and to keep said water-power plant in repair during the continuance of this lease. * * * Said first party will provide in its buildings suitable space for the erection of dynamos by which to supply the electrical power for said second party to the extent of three thousand horse-power, * * *. Said second party shall and will at its own cost and expense procure and erect on said foundations such dynamos as it may elect, together with such appliances for connecting said dynamos with the turbine shafts of said first party as it may deem suitable, and shall also conduct at its own cost and expense the electricity and electrical power developed * * * to the buildings to be erected by said second party on the upper bank * * *. The mechanical horse-power for which the party of the second part agrees to pay eleven dollars per horse power per annum, is to be measured or ascertained as developed on the shafts between the turbines and the dynamos * * *." It may not be said that this agreement, drawn many years in advance of the Public Service Law, was phrased to evade that statute, which gives the Commission jurisdiction concerning sales of electric energy, by distinguishing between mechanical power developed on the turbines belonging to Power and measured on their shafts and the electric energy developed by Aluminum's generators. Some of the later leases

involve other lands and additional power generated in a new location, but they each carry out the general terms of the quotations.

The reason for the Commission's interest in this rate proceeding is on behalf of the State, as it is expected that it will result in a reduction of rates to purchasers and consumers of Power's electric energy. That company is entitled only to a reasonable return on the fair value of the property used and useful in the public service, and if the price paid by Aluminum is increased other rates should be correspondingly decreased. The opinion of the Commission contains a schedule under a heading, " Comparison between cost of mechanical power furnished under contracts and computed cost of equivalent electric power if supplied under filed schedules in effect at the time." I will give only two of the ten years:

|  | " Charge pursuant to schedule | Pursuant to contract | Difference |
|---|---|---|---|
| 1928............ | $982,884 | $416,532 | $566,352 |
| 1936............ | 942,596 | 357,724 | 584,872" |

While Power is rationed as to earnings permitted, it doubtless would welcome the increased revenue. As to that issue it and Aluminum are at variance because of self interest, as it would result in increased cost to Aluminum, which asserts its right to buy at the lower rate under the ancient grants, contracts and agreements.

Each of the corporations has an interest in common in connection with Power's title to the use of the waters and the lands of the freehold and land under water at Port Day. Power because its right to exist is involved, and Aluminum that of any tenant or grantee in connection with a claimed flaw in the landlord's or grantor's title.

The unanimous opinion of the Commission asserts that the Conservation Law (§ 621) gives jurisdiction to the Commission to fix rates under the Public Service Law (§ 66). Thereunder it is necessary that the State have a " proprietary right or interest " in the waters diverted for the development of the power. In opposition it is argued that the State has no " proprietary right or interest " in the waters diverted but that Power is " the owner so far as the law of New York could make it owner of land and water rights on the American side of the River above the Falls," as was written by the late Justice Holmes (*International Paper Co.* v. *United States*, 282 U. S. 399, 404) concerning the petitioner's title to leasehold property in a proceeding commenced by the lessee of one of the corporations now merged in Power against the United States to recover compensation " for property rights in water of the Niagara River " taken for war purposes by the United

States under its right of eminent domain. Power asserts title to the land in the river bed adjacent to Port Day, granted it by the State. " The power of the Legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this court too often to be open to serious question at this late day. (*Lansing* v. *Smith*, 4 Wend. 9; *People* v. *N. Y. & Staten Island Ferry Co.*, 68 N. Y. 71; *Langdon* v. *Mayor, etc., of N. Y.*, 93 N. Y. 129.) " (*Matter of Long Sault Development Co.*, 212 N. Y. 1, 8.) " Grants to the owners of the adjoining uplands, either for beneficial enjoyment or for commercial purposes, have long been authorized and recognized as one of the uses to which the State may lawfully apply such lands." (*Coxe* v. *State*, 144 N. Y. 396, 407.) The taxing authorities of the State assessed as real property the land under the river near Port Day and as a corporeal hereditament and real property the right which one of the predecessors of Power received from the Legislature (Laws of 1896, chap. 968) " to take, draw, use and lease and sell to others to use the waters of Niagara river for domestic, municipal, manufacturing, fire and sanitary purposes, and to develop power therefrom for its own use and to lease and sell to others to use for," etc. (*People ex rel. Niagara Falls Power Co.* v. *Smith*, 70 App. Div. 543; affd., 175 N. Y. 469.) " The right to the use of the water of a flowing stream, navigable or unnavigable, arises by mere operation of law as incident to the ownership of the bank and is a part of the estate of its owner. (*Lyon* v. *Fishmongers Company*, L. R. 1 App. Cas. 662; *Sisson* v. *Cummings*, 35 Hun, 22; *Webb* v. *Portland Manufacturing Co.*, 3 Summ. 189; *Danes* v. *State of N. Y.*, 219 N. Y. 67; *Duckworth* v. *Watsonville W. & L. Co.*, 158 Cal. 206, 216; *Washington Ice Co.* v. *Shortall*, 101 Ill. 46.) " ( *United P. B. Co.* v. *Iroquois P. & P. Co.* 226 N. Y. 38, 46.) The doctrine quoted from the *Iroquois* case has been the unquestioned law of this State since the decision in *Rumsey* v. *N. Y. & N. E. R. R. Co.* (133 N. Y. 79), which overruled *Gould* v. *Hudson River R. R. Co.* (6 id. 522) and other earlier cases. (*Town of Brookhaven* v. *Smith*, 188 N. Y. 74.) The right of one of the predecessors of Power to draw water for power purposes is by the law of New York " a corporeal hereditament and real estate." (The late Justice HOLMES, writing in *International Paper Co.* v. *United States, supra*, p. 405.)

The center of the Niagara river is the boundary line between the United States and Canada, and the diversion of water therefrom was, in 1910, the subject of a treaty between this country and Great Britain. This, the highest of all laws, permits 20,000 cubic feet per second to be diverted on the American side. Following the

legislative authorization for the consolidation of the three power companies into the present corporation which is designated as Power, the Legislature enacted (Laws of 1918, chap. 597): " Any new corporation constituted by the consolidation * * * may reconstruct, alter, enlarge and improve its works, canals, tunnels and plant or any part thereof, and may construct new works, canals, tunnels and plant through which it may utilize any of such waters. To such ends such new corporation may exercise all the powers heretofore or hereafter conferred upon either or all said corporations so consolidated, provided, however, that nothing herein contained shall authorize such new corporation to divert from the Niagara river any water in excess of the amount heretofore authorized by the State of New York in respect of the corporations so consolidated. Provided further that if the corporation constituted by such consolidation shall divert from the Niagara river for power purposes more than fifteen thousand one hundred cubic feet per second, there shall be reserved to the State the right to charge an equitable rental therefor in such amount and in such manner as shall hereafter be provided by law."

*Matter of Niagara Falls Power Co.* v. *Water Power and Control Comm.* (267 N. Y. 265) is the only decision cited in the opinion of the Commission. There the Commission had fixed an equitable rental of fifty cents per horse power for 4,400 cubic feet per second which had been taken in addition to the 15,100 cubic feet per second mentioned in the 1918 statute. For the first 500 cubic feet per second remaining to bring the total diversion up to the quantity permitted under the treaty, the Commission fixed five dollars per horse power as the equitable rental. The case went to the Court of Appeals on a certified question, " Was the charge of five dollars per horse power as imposed by the Commission in excess of the power of the Commission under the statute prescribing an equitable rental, under the evidence presented in this proceeding?" The Conservation Law (§ 616) requires each licensee of power sites and lands, " the title to which is vested in the State," to pay " an annual charge measured by a fair rental value thereof." The court determined that section 616 did not apply, but that chapter 597 of the Laws of 1918, implemented by subdivision 13 of section 614, did. The latter provides: " 13. Shall have the power to fix and determine, after a hearing held upon notice to the parties interested, the amount of an equitable rental, which is hereby charged pursuant to the reservation made by chapter five hundred and ninety-seven of the laws of nineteen hundred and eighteen, for the diversion, as specified in such chapter, of water from the Niagara river in excess of a daily diversion at the rate of fifteen

thousand one hundred cubic feet per second, and which shall be fixed in like manner as if the application was made for a license under the provisions of this article before the water was used, and the people of the State may sue for and collect in behalf of the State such rental as so fixed and determined." The opinion states (p. 276): " The word ' rental ' is by no means limited or intended to be used in connection with real estate or lands, tenements and hereditaments conveyed by the State. It has reference to a rental charge for the use of water, and such is its meaning in chapter 597." However, the opinion says concerning the State's proprietary interest (pp. 277, 278): " The power company contends that the State has no proprietary interest in the sites. How great is the State's proprietary interest in these sites in the navigable Niagara river, it is unnecessary to determine, since the State has a valid claim to an equitable rental for this fraction of the total amount of water diverted, based upon the acceptance of the provisions of the law of 1918 (Chap. 597)." Relying solely upon that authority, the Commission has assumed jurisdiction under section 621 of the Conservation Law to regulate and fix rates upon the theory that the Court of Appeals has said that the power is developed from waters " in which the State has a proprietary right or interest."

The order of the Commission, drawn apparently from the form used to fix rates for the sale of electricity under the Public Service Law (§ 66, subd. 14), directs and requires Power " to file    *    *    * an amendment to its tariff schedules providing a service classification appropriate to and covering the service furnished by it to Aluminum Company of America and containing a schedule of rates for such service, and that on and after the effective date of such service classification all charges to the said Aluminum Company of America shall be in accordance with such classification." A breach of the contract between Power and Aluminum should not be required as a by-product of a rate proceeding. These corporations have large property rights and are subject to obligations of which common-law courts have jurisdiction. The Conservation Law (§ 621) grants jurisdiction to the Commission " to regulate and control the use and distribution of all power generated    *    *    * by the use    *    *    * of any waters of the State in which the State has a proprietary right or interest, and to fix reasonable rates to be charged." Thereunder the Commission is to fix the rates. Power should not be directed to violate the provisions of its contract with Aluminum. The Commission is not a court with general jurisdiction to abrogate contract provisions. It may fix rates, but the adjustment of the rights of the parties under the contract as modified is for the courts, if the parties are unable to agree.

Section 66 is a part of article 4 of the Public Service Law. Its application is shown by the first section thereof: " § 64. Application of article. This article shall apply to the * * * furnishing and transmission of electricity for light, heat or power." It is neither stated in the opinion nor found in the order of the Commission that Power furnishes or transmits electricity for light, heat or power to Alumium. The Conservation Law (§ 621) directs that the Commission regulate, control and fix rates when water in which the State has a proprietary interest is diverted and used " for power purposes." This language gives jurisdiction whether the power is mechanical or electric. The Commission has not classified the power as electric; therefore, article 4 of the Public Service Law does not apply, and an order under section 66 should not have been made.

The request of The Niagara Falls Power Company to appear as *amicus curiæ* should be granted. Arguments are presented that its constitutional rights are attacked and that by this and other actions and proceedings it may be deprived of its property without due process or just compensation. Such issues should not be determined by the decision of an administrative board of which there is substantially no review on questions of fact. *New York ex rel. Consolidated Water Co.* v. *Maltbie* (303 U. S. 158) determined that a plenary action may not be maintained following the participation in a rate proceeding and a review under article 78 of the Civil Practice Act. The power company might well wish, and should be permitted, to test its rights in a plenary action as outlined in *Crowell* v. *Benson* (285 U. S. 22, 60); *St. Joseph Stock Yards Co.* v. *United States* (298 id. 38, 51) and other cases.

A determination should be made that the Commission has jurisdiction under the Conservation Law (§ 621) to fix rates but not to require The Niagara Falls Power Company to do so. The order should be annulled and the matter remitted to the Commission for the purpose of fixing rates.

Determination annulled, with fifty dollars costs and disbursements, on the ground that the Public Service Commission has no jurisdiction to make the order.