Sandford, J.,
dissented, and delivered the following opinion: The complaint charges the defendants with 11 negligence and carelessness, in not having or keeping in repair and in a safe condition, the usual and ordinary travelling portion ” of “ one of the public streets or thoroughfares of the city of New York,' known as the Fourth Avenue by means of which, the plain-1 tiffs’ carriage and horses were precipitated from the avenue, about forty-five feet, into an excavation in the centre of the-avenue. The horses were killed, and the carriage destroyed. The answer puts in issue the injury ; and denies that it occurred by reason of any carelessness, negligence, or wrongful misconduct on the part of the defendants. It alleges that the excavation in the avenue was made by the Harlem Railroad Company, pursuant to authority conferred upon it by law, and that it was-the duty of that company to keep the avenue from becoming dangerous from the excavation. The reply states, that the injury did not take place on that part of the Fourth Avenue which the-railroad company was authorized to occupy and enjoy; but upon that part, which was exclusively under the care and control of the defendants, and which was vested in them, as one of the public streets and avenues of the city ; and that it was their-duty to keep the avenue, or so much of it as was laid out and Opened for a public avenue or street, in good repair.
The action, therefore, was founded upon the duty of the city, corporation to keep the avenue in repair, and their neglect to-perform this duty. The judge’s charge to the jury, was briefly,- “ that if the defendants suffered the highway, at the place in? *306 question, to get out of repair, and the injury to the plaintiffs resulted in consequence thereof,” the latter were entitled to-a verdict, unless their own negligence occasioned the accident. He was asked to charge them, “ that the defendants were not liable in this action, for any injury which may have resulted in consequence merely of the highway in question being out of repair which request was refused.
The injury to the horses and carriage was proved. The Fourth Avenue, as we know judicially, was one of the streets or roads laid out by .the commissioners under the act of 1807, and extends some six milés in length, from what was formerly the head of the Bowery, to Harlem river. The Harlem railroad is laid upon this avenue, under the act of 1831 (Laws of 1831, eh. 263, §§ 10,16), and the excavation referred to was made for the construction of that railroad. The point where the accident occurred, was between 36th and 37th streets ; and the avenue had been opened as a public street, by judicial proceedings, under the Act of 1813, to and above that point. It had never-been paved, though it had been regulated, and curb and gutter stones placed along the line of what was intended to be made a side walk. The space between the curb stone and the excavation made for the railroad (which was here about forty feet deep, and was open and unprotected), was very narrow ; and by means of the rains,-the ground had so washed away, that there was not room left for the passage of the plaintiffs’ carriage. This space had been used as a public road for two or three years.-
This statement presents all the facts established at the trial; and the question is, do they warrant the recovery as matter of law ? Do they show any liability, on the part of the corporation, to an action for the injury sustained by the plaintiffs ?
And, first, the liability, if any, does not arise from the city charters. It is true, the charter of 1686, granted to the city, all the streets, lanes, highways, and alleys within the city, and on Manhattan Island, for the public use and service, with full power to order and direct their repair ; but the corporation could not take private lands, without consent, to make new streets or highways, and the charter gave it no power to raise money for making or repairing streets or roads. So in the *307 charter of 1730, the same grant of the streets, highways, bridges, &o., is repeated, with the power, in more ample terms, to repair the same, and to lay out other streets, highways, &c. As Chancellor Kent remarks (City Charter, 143), “ this is a grant of a public nature, without any private interest, or property, or revenue connected with itand he adds, that the legislative directions, and powers generally obtained on the application of the corporation, have become so ample, full, and various, that the charter power seems to be, in a great measure, absorbed and lost in the new statute powers. (Ibid. 145.)
Under the charters, the corporation became possessed of the roads and streets then existing, with no greater rights or interests in them, than are held and enjoyed by the respective towns, under our state laws. The corporation did not become seized of the fee of the land embraced within the limits of such streets or roads as property ; but it was entitled to them for the public use and service, so long as they remained streets or roads. There were no means granted to the corporation for the making or repairing of the streets and roads, nor was that duty imposed by the charter, either for a consideration conferred, or as a condition of the enjoyment of rights and privileges granted.
The corporate powers in respect of streets, roads, &c., wore soon found to be of no practical use; and they were rapidly superseded or absorbed by the statutory provisions, to which we will presently refer.' In fact, all the power exercised by the corporation at this day, is derived from the statutes ; and its duty and liability must be referred to the same source. Especially is this true of the streets, which, like this avenue, had no existence till a century after the charter, and derive their being from the Act of 1807. This city could not have laid out or established this avenue as a public road, under either of its charters ; and to hold that the city is bound by taking a charter conferring upon it existing roads, to keep in repair roads not then in being, and which, as a corporation, it could not originate, seems to us not to be consonant either to law, or good sense.
The authorities cited by the plaintiffs to show a liability founded upon the charter, do not, we think, sustain their point. *308 In the Mayor of Lynn v. Turner (Cowp. 86), which was virtually a case of private nuisance, the corporation was bound by prescription to cleanse and keep free the creek which was obstructed. This absolute duty, probably was, as Lord Mansfield suggested the fact might be, “ the very condition and terms of their creation or charter.” In the Mayor, &c., of Lyme Regis v. Henley (5 Bing. 91, S. C. in Error, 3 Barn, and Ad. 77, and in the House of Lords, 1 Bing. N. C. 222), the corporation, by the express terms of its charter, was bound to maintain and keep in repair the pier-quay and the sea-wall which protected the plaintiff’s tenements. It was not only an express and positive condition of the grant, but it was made for a valuable consideration, viz. a grant of the tolls and profits of the quay, the remission by the crown of twenty-seven marks of the annual farm due previously from the borough, and the grant of a license to dig stones and rocks out of the sea and on the shore, for the reparation as well of the quay and sea-wall, as for the common works of the borough. Such being the duty of the borough, the plaintiff, Henley, whose tenements were injured in consequence of its neglect to keep the sea-wall in repair, had precisely the same remedy by private action, that one would have against another for damages occasioned by the latter’s omission to keep in repair a mill-dam, erected by him across a public river, under a legislative grant of authority for that purpose. These authorities show nothing more than this, that a municipal corporation, and in like manner a private person, to whom a franchise is granted on a condition or an undertaking to do some particular act or thing, is liable, for an omission to do the same, to individuals who sustain a special and peculiar injury by such omission. They do not aid the plaintiffs in this^pase, because no such condition or undertaking, with respect to the Fourth Avenue, is found in, or is to be implied from, the charter of this city.
We come next to the liability of the corporation of the city, as derived from the statute law. Within five years after Gov. Dongan’s charter was granted; the colonial legislature passed an act for regulating the streets, &c., of this city, called in the act “ the Metropolis of this Province." (Act of 1st October, 1691, 1 Van Schaack’s Gol. Laws, 8.) This act enabled the *309 corporation to appoint surveyors of the streets, &c. (who were also to see to the laying out and regulation of streets, sewers, &c.) ; and to lay out new streets and sewers, and to recover the expense of pitching and paving the streets, lanes, and alleys of the city, by a tax upon the houses benefited thereby.
On the 7th of November, 1741, an act was passed “ for mending and keeping in repair the post road from New York to Kingsbridge.” (Yan Schaack, 211.) The preamble states, “ that the highway named ought to be kept in good repair, but the act of the general assembly then in force for that purpose, was found very inconvenient.” No allusion is made to the charter, or to any duty on the part of the city, to keep it in repair. The repair of the road, in three distinct sections, was imposed upon the inhabitants of three several portions of the city, for each of which sections the court of Quarter Sessions was to appoint a surveyor, whose duty it was to call out the inhabitants to work on the road. Penalties were imposed on them and on the surveyors, for their neglect to discharge the respective dutiep prescribed by the act. On the 25th of November, 1751 (Van Schaack, 303), a like act was passed respecting the “ Bloomendale ” road, and the inhabitants of the Bloomendale ” division or district were exempted from working on the Kingsbridge road. No inhabitant was compelled to work on the road more than six days.
The act of May 4th, 1754 (Yan Schaack, 339), in order to prevent nuisances in the city to the southward of the “ Fresh Water,” authorized the corporation, on the neglect of the owners, among other things, to pave the streets “with good and sufficient pebble stones.” The lots fronting on such streets were to be leased by the corporation to meet the expense of paving them.
The origin of the existing law respecting roads in this city, is found in the Act of October 20th, 1764 (Yan Schaack, 458), “for the better regulating the public roads in the City and County of New York, and to levy money to defray the expense thereof.” This act appointed the mayor, aldermen, and commonalty of ,the city, commissioners to regulate and keep in repair the existing highways ; and to lay out, regulate, and keep in repair such other public roads or highways as should *310 be laid out by act or acts thereafter to be passed for that purpose. The commissioners were to appoint one or more surveyors or overseers of the roads, and to employ laborers and workmen to keep them in repair ; and they were authorized to levy such sums by tax, as might be necessary to defray the expenses of executing the act. Certain duties were prescribed for the overseers of the roads, and penalties imposed on them for neglect of duty. This act was limited to January 1st, 1770; but it was continued by acts passed December 30th, 1769, and January 22d, 1772 ; and was re-enacted, with little variation, March 9th, 1774 (Van Schaack, 547 and 633 ; edition of Laws of N. Y. from 1773 to 1790, page 38, ch. 23). The same provisions, substantially, were enacted in the “ act for the better regulating the public roads in the City and County of New York,” passed March 21st, 1787 (1 Greenl. 417), except that there was no authority to raise the expense by a tax. "W e next refer to the great act of April 3d, 1807 (5 Kent and Radcliff’s Laws, 125), under which nearly the whole of Manhattan Island was, within the next five years, laid out into blocks, with intersecting streets, by the commissioners designated in the statute. The act appointed three persons “ commissioners of streets and roads," for the purposes specified. The exclusive power was conferred on them, to lay out streets, roads, and public squares, in that part of the city lying to the northward of Greenwich lane, Art street, and North street. They were authorized to enter upon such lands as they deemed necessary to be surveyed or used for forming any street or road. They were to make and file maps of the streets and roads laid out by them. By the ninth section, the corporation was authorized to open any of the streets, roads, or public squares so laid out; and on completing the opening, the corporation was to become seized in fee of the land taken for the purpose, in trust, that it should be kept open for a public street, road, or square for ever.
On the 16th of June, 1812, was passed the “act relative to opening, laying out, and forming and extending., enlarging, and otherwise improving streets, avenues, squares, and public places in _ the city of New York,” (6 Kent and R. 518.) The provisions of this act, which was passed to provide in a proper manner, for opening the streets laid out by the commissioners, *311 in their grand and magnificent execution of the act of 1807, are all re-enacted, in sections 177 to 190, inclusive of the “Act to reduce several laws particularly relating to the city of New York, into one act,” passed April 9th, 1813. (2 Rev. Laws, 342, 408.) In the last mentioned act, all the laws relating to streets and roads were revised. Under the head of “ Paving and regulating streets, Ae.,”' (2 R. L. 407 § 75,) is found the provision for pitching, paving, and amending the streets, by means of an assessment of the expense among “ the owners or occupants of all the houses and lots intended to be benefited thereby,” similar to the mode pursued from the year 1691, under the statute of that year. “ The regulation and repair of public roads,” forms another head of the act of 1813. It continues the corporation as commissioners to regulate and keep in repair, the present and future roads or highways, in the city, (2 R. S. 433, § 193, Ac.) in the same manner as the law then was, and as it had been since 1787- Another subdivision of the act is entitled, “ Opening and laying out streets, Ac.,” and contains the sections of the act of 1812, before mentioned. It is true, the sections speak of opening “ any street, avenue, square, or public place,” without naming roads or highways; but it describes them as those “ laid out by the commissioners of streets and roads,” Ac., under the act of 1807. ■
Continuing in legislation the distinction between streets and roads, the last amended charter of the city, (Laws of 1849, ch. 187, page 278, Ac.) which distributes the executive business of the city into various departments, creates a “ street department,” and a “ department of repairs and supplies each having a distinct head, elected by the people of the city. To the “ street department” is given, among other things, the cognizance of opening, regulating, and paving streets, and the construction of public roads, when done by assessment - And the collecting the assessments connected with the expenditures for those purposes. To the “ department of repairs and supplies,” is given, among other things, the cognizance of all repairs and supplies of and for roads and avenues, and also for public pavements, as distinguished from those made by assessment on the adjacent houses and lots. This department contains four bureaus, or branches,' the chief officers, of two of which, are denominated respectively, *312 the “ Superintendent of roads,” and the “ Superintendent of pavements.” (Act of 1849, § 9,12,13.)
From this summary of the statutes, it appears that, for almost a century, a distinction has been maintained in all the legislation concerning the city of New York, between streets and roads or highways, in respect of their being amended and kept in repair. The corporation, as such, was enabled to pave and repair the streets of the city, by means of a local assessment on the houses and lots benefited, while it had charge of the roads or highways, as commissioners, with power to appoint overseers of roads ; and with no authority since 1787, to levy the expense of repairs by any local or general tax or assessment. As recently as 1849, we see this distinction made in the most pointed manner, the care of the roads being vested in a different department from that exercising the general authority of paving the streets. Indeed, it is - separated from all those public works, the expense of which is defrayed from local assessments on the property benefited. Nor is this an unmeaning distinction, in the proper use of language. A street, strictly defined, is a paved way or road : a highway or road, is an open way or public passage;—it is ground appropriated for travel, forming a communication between one city or town and another. A public way leading from one part of a city to another, as from the Park to the Battery, (and such are universally paved in some mode,) is a street; one leading from the compact part of this city to Harlem, or to Manhattanville, is a highway or road.
The act of 1807, for laying out the suburban part of the city, did not lose sight of this distinction. The commissioners were to lay out streets and roads.. And although in the act of 1812, revised in 1813, for opening streets, &c., there is no express provision as to opening roads by that designation, reference is had to the work of the “ commissioners of streets and roads ” of 1807 ; and the omission is probably owing to the fact, that all the public ways laid out by those commissioners, were denominated either streets or avenues, on their maps. It could never have entered the legislative mind in 1812, that all the ways thereafter to be opened for public travel, in that part of the city covered by the commissioners’ map, a tract from seven to *313 eight miles in. length, and about two miles in breadth, no portion of which was then built upon, either as city or suburbs, were to be streets, in the proper sense of the word, from-the very date of their being opened respectively. The prophetic augury of the wonderful growth of the city, which dictated the act of 1807, and the action of the commissioners under that act, marking out and preparing so large a space for its regular and systematized expansion, rightly anticipated that, in the progress of that expansion, many, if not most of the public ways thus marked out, would necessarily be opened and used for public travel to and from the compact parts of the advancing city, some for longer and others for shorter periods, before the accretion of a dense resident population upon such ways would call for the great outlay of expense requisite to make them graded, regulated, and paved streets ; which expense, from 1691 to this day, has been levied on the adjacent property, as being peculiarly benefited by such improvements.
We know, though it is perhaps knowledge which we cannot act upon judicially, that in the conduct of the business of the corporation for a very long period, portions of streets and avenues laid out, and so termed by the commissioners, and after-wards opened under the act of 1813, have been worked as common highways, or as the usual phrase is, as “ public roads and as such, used for travel many years before they were' required as streets, or were regulated and paved. While in this transition state, such streets and avenues are not streets in the proper use of that word, or within its meaning as used in section 175 of the act of 1813 : they are roads or highways.
The circumstance that in the section under which streets are regulated and paved, they are denominated streets before any such work is done, does not impair the argument. They are spoken of as “ streets,” in anticipation of what they are to be when made. The same form of expression is frequently used in providing for the forming of various objects of legislative creation. While inchoate, they are designated by the name appropriate to them only when completed.
It h§is been suggested, that as there were no roads laid out by that name by the commissioners under the act of 1807, all the ways by them laid out are streets, and nothing else, from *314 the moment they are opened by law. What we have said, in a great measure, answers this suggestion. They were called streets and avenues on the commissioners’ map ; and it was fully expected they would become streets in the progress of time. Whether they should be opened at all; when they should be opened; and how they should remain after opening—whether as a common road, or a street made at the expense of the owners of the adjoining lands-—rested in the uncontrolled discretion of the corporation. If, in mercy to such owners, the corporation choose to continue the streets, when opened, as public roads, worked at the common expense of the city, instead of visiting upon them, as soon as the street is opened by law, the heavy expenses incident to the regulating, paving, &c., under the 175th section, no citizen or court can call in question its determination. In constituting the mayor, aldermen, and commonalty, &c., commissioners in the manner described, the legislature conformed the regulation of roads in this city to the general system adopted at an earlier period, respecting roads in the other counties of the province. That was a system of officers, described as “ commissioners to regulate and keep in repair,” &c., the highways, using precisely the same words in such description as are contained in the act of 1764, and the subsequent acts regulating public roads in the city of New York, together with overseers of highways under them. Thus, in 1732, such commissioners were organized in each township and precinct of Suffolk county ; in 1744, in the county of Dutchess ; in 1745, in Westchester county ; and by an act of the same date, in the counties of Kings, Queens, Richmond, and Orange; in 1756, in Ulster county ,• in 1760, in Albany county. (Livingston and Smith’s Colonial Laws, vol. 1st, pages 203, 345, 359, 365 ; vol. 2d, pages 85,190.)
This system gradually succeeded the one prescribed by the first colonial act on the subject, May 6th, 1691 (Van Schaack, 3), by which three “ surveyors and orderers” were to be chosen in each town for like purpose. The officers thus originated by the later colonial acts, are the “ commissioners of highways” of our state legislation, though they were not designated by that form of words until 1787. (See the acts of March 11th, 1779 ; May 4th, 1784; April 20th, 1787; and March 21st, 1797; *315 Laws N. Y. 1773 to 1790, page 64 ; 1 Greenleaffs Laws, 105, 458 ; 3 ibid. 252.) Their powers and duties have remained substantially the same from the time of their origin, so far as they affect the questions before us.
In this case, there was no evidence which proved the Fourth Avenue, at or near the place where the accident occurred, to be a street, within the meaning of the 175th section of the act of 1813. On the contrary, the proof was decisive, that, although opened, it never had become a street in that sense. It was simply a road or highway, at the place in question, and the liability of the corporation is to be derived from sections 193 to 197 of that act.
In regard to roads, the corporation (or the common council) are commissioners to regulate and keep them in repair. The full control of the roads is given to the corporation, as it is to commissioners in towns; but no power is conferred to raise the requisite means, either by a tax, or by calling out the adjacent inhabitants to perform labor upon thepi- The power of the corporation as commissioners, is similar to that exercised by the commissioners of highways in towns, for more than a century, and the duty imposed is commensurate with that devolved upon those commissioners. That duty is not absolute, and to be performed under all circumstances, but is an imperfect duty, dependent upon the facts—that the commissioners have the requisite funds or means to discharge it, that notice of the want of reparation has been communicated to them, and the like. It follows, that to establish a liability for its neglect, the facts necessary to show that the duty existed, must be proved. Thus, it has been decided, that to maintain an indictment against commissioners of highways, for neglect of duty in not repairing a bridge, it must be averred that they had funds in their hands, or other specific means provided by law, for that purpose. (The People v. Commissioners of Highways of Hudson, 7 Wend. 474; The People v. Adsit, 2 Hill, 619; Barker v. Loomis, 6 ibid. 463.) Of course, the same proof would be necessary to maintain a private suit for damages, conceding that such a suit would lie against commissioners of highways.
But it will be said, there was no lack of funds in the hands of the corporation, to keep this and all other highways in repair ; *316 that it has a large amount of productive property ; and every year is authorized by law to raise money by tax for all its municipal purposes and wants. Let us examine these propositions : and in so doing, we suppose that we are to judge this corporation by the same rules of law and of reasoning, that we would, i& it were an incorporated village, whose trustees were by its charter made commissioners of highways, and whose means for repairing its streets and roads, were annually granted by the supervisors of the county, or by the legislature. We shall take it for granted, that the magnitude of its municipal taxes and revenue has no bearing on the case.
First. It can scarcely be seriously urged, that the private property (so to speak) of the corporation has any thing to do with the subject. That property was not granted for the purpose of maintaining roads, nor was there any such condition attached to the grant. It was given for the purpose of municipal government, long before this avenue was in existence, or contemplated. The statutory power respecting highways, under which, if at all, the corporation is to be subjected to liability, was'conferred' independent and irrespective of the corporate property, and at a subsequent period ; and the corporation has never assumed any burden in respect of such highways, by reason or on account of its private property.
Next, as to the funds raised by tax. It may be said, in the first place, that there is no proof in the case, that in December, 1849, the corporation were possessed of any such funds; and it is no answer to the suggestion, to say that it either had the funds, or might have had them for the asking. It may be practically true—but we cannot act upon such a suggestion—that the legislature every year authorizes the city of New York to raise as much money by tax, as the city authorities deem it proper to ask for. And it may seem a very small thing to doubt that this great city, in December, 1849, and at all times, had abundant means for the repair of its roads. But we are not at liberty to act upon conjecture ; and, whether the doubt be small or great, it must be obviated by proof, where the fact is the foundation of the liability. Such moneys as the law authorizes to be raised by tax, are raised for designated objects, and they are to be drawn out and disbursed for the purposes to *317 which they have been previously appropriated. It may, therefore, very well happen, that an appropriation for a particular branch of the expenditure of the city may be exhausted ; while in other branches there may be a surplus of the money raised by the annual tax. In point of fact, such deficiencies do occur every year.
Again, the corporation sought to be charged in this suit, is not the corporate body, which is authorized by the statute, to raise money by tax in the city and county of New York. That body is the board of supervisors, an entirely distinct legal person, and as capable of being sued as the corporation of the city. This may be seen, by reference to the acts under which moneys were thus raised in 1848 and 1849. (Laws of 1848, ch. 297, p. 429 ; Laws of 1849, ch. 276, p. 402.) This, though a sufficient answer, as to the power of the corporation to raise by tax all the funds it pleases, is, perhaps, a technical answer; but for the purposes of this suit, the argument is conclusive, upon the absence of proof that there were funds applicable to the repair of the highways at the period in question. We have seen, that in respect of roads, the duty of the corporation is an imperfect, and' not an absolute duty; and that, in such a case, it is not liable even to an indictment, without averment and proof that the duty had become absolute.
It was suggested by a very learned judge, in one of the cases cited, that perhaps, in a civil action against commissioners of highways, it would be enough to show that the law imposed the duty of repairing ; and it might be left to the officer to excuse himself, if he can, by showing the want of funds, (4 Hill, 634, per Bronson, J.) But it seems a decisive answer to the suggestion, that the law does not impose the duty, except in respect to funds existing ; and therefore the fact that there are such funds, must be found, before any duty is shown to exist. It by no means follows, that if the existence of such funds were shown, this suit can be maintained. It is supposed, that a recent case (Adsit v. Brady, 4 Hill, 630) goes far to maintain the doctrine that a civil action may be brought against a public officer for neglect of duty, in every case where an individual sustains a personal or pecuniary injury by such neglect; but the case is not strictly applicable. In the act of 1813, the corporation is *318 empowered to appoint overseers of the roads; and as it can act only by its officers or agents, the immediate duty of causing the roads to be repaired, devolves on such overseers, and the neglect of that duty is presumptively chargeable upon them. So far as the corporation is concerned, it is a constructive negligence, by the act of its officers or servants, in discharging a. public duty, not growing out of, or founded upon any pecuniary or private benefit to the principal. In the case in 4th Hill, the action was directly against the subordinate officer or servant, and not against the canal commissioner having the charge of the canal where the injury happened ; as it should have been, if it were analogous to the attempt made to subject the corporation, in this suit.
The circumstance that the fee of the land in the Fourth Avenue, where it is opened, is vested in the corporation, has been mentioned as a further reason for subjecting it to the liability asserted by the plaintiff, irrespective of the provision of adequate funds for the repair of highways. It is said no person except the corporation and its agents can enter upon the avenue, or use its soil for the purpose of making.repairs. We.do not think the title to the soil of the road affects the case at all. The fee is vested in the corporation, merely in trust for a public road. It takes no beneficial interest in the land, in a proprietary sense. In the streets, in what is called the old part of the city, (laid out before the act of 1807,) where the fee of the soil remains in the owners of the lands fronting on such streets or roads, as is the fact in highways in towns throughout the state, any person other than those authorized by law, who enters upon and digs up the soil, becomes liable to an action by such owners, He who enters in like manner upon the streets owned in fee by the corporation, subjects himself to no greater liability —it is only to a different party.
Another argument founded upon the vesting of the fee in the corporation, is that it is upon a trust to open the land and to keep it in repair as a street, and that either on the ground of an express trust, or as a franchise for the public benefit, there is an absolute liability imposed on the corporation to keep such street in repair. The trust, by the statute, is, to keep i't open as a public street; which means simply, that the corporation *319 shall never appropriate the land taken for a street from private owners, to any private use or purpose of property or revenue. In what way or manner it should, as a street, be improved, maintained, or kept, forms no part of .the trust; it is regulated by the express provisions of the subsequent statutes. If the trust were held to go that length, the corporation would be liable for non-repair, even if the legislature were to withhold entirely leave to raise money by tax, for the making and repairing of roads. As to this grant of the fee, for the purpose of streets, being a franchise for the public benefit, it may be said that being for the public benefit purely and solely, without any pecuniary interest or profit accompanying or growing out of it, the grant subjects the recipient to no common law liability, nor to any duty other than that imposed, by its express terms, or by subsequent statutes. We think, however, that instead of its being treated as a franchise, it is to be regarded as an incident to the legislative authority conferred upon the corporation, in respect to streets and roads, in which authority the corporation act as public officers, executing the same powers, which, in towns, are given to the highway officers chosen by the people.
We will now look into this question of the civil liability of municipal corporations, and other functionaries, for neglect of duty in re-paying highways. The plaintiffs do not claim, and there is no pretence for claiming that such corporations, when charged by statute with any specific duty, irrespective of franchise, arc subjected to a more stringent liability than public officers charged with the same, or analogous duties. And if a public officer would not be liable in a civil action, when clothed with such powers as are conferred by the 175th section of the act of 1813, the corporation is not liable in this suit, either under that section, or as commissioners of highways. It seems to have been assumed by judges in several recent cases, that commissioners of highways are liable in a civil action, at the suit of the party injured, for. neglect of the duty to make repairs if they had the needful funds, as they doubtless are to indictment; but there has never been a decision to that effect, and we believe our associates agree with us that such is not the law. It was certainly the rule of the common law at a very early period, that no private or civil action would lie in *320 such a case. (Year Book, Easter T. 5 ed. 4, pi. 24 ; Brooke’s Abr. acción sur le case, pi. 98.) Such has been the law in England for the last four hundred years. It is the law of this state, unless changed by some judicial decision. In most of the New England States, towns have been made liable by statute, in civil actions, for injuries arising from this cause (Momer v. Leicester, 9 Mass. 249; also 20 Maine R. 246, and 17 Conn. R. 475), but we have no similar statute here. The commissioners of highways of towns, have succeeded substantially to the powers and duties as to highways, which in England devolve upon parishes (See Morey v. Town of Newfane, 8 Barb. S. C. R. 650). But unlike those parishes, they are not subjected to an absolute duty in that respect. Yet with the unqualified duty there, the only remedy against the parish is by indictment (Com. Dig. Chimin, H. 4, B. 3). And although the parishes there for centuries have appointed surveyors of highways, in most respects analogous to our overseers in towns, there is no instance of a civil action against the surveyors for an injury, by reason of their neglect to repair.
It is said, that the case falls within the principle, that when an individual sustains an injury by the misfeasance or nonfeasance of a public officer, who acts or omits to act contrary to his duty, the law gives redress to the injured party by an appropriate action. The principle is a sound one when applied to public officers who act for particular individuals, and for an equivalent reward furnished by them or by the public for such service, as in the case of a sheriff, in the execution of civil process ; but is it applicable to public officers who owe no duty to individuals and perform none especially for them, but act for the public at large, and more particularly, to such officers for a fault in their subordinates or servants ? (See Young v Commissioners of Roads, 2 Nott & McC. 555.) For a wilful and malicious omission of duty, in this class of officers, there may, perhaps, be a civil action in favor of the party injured. But for a mere neglect, without malice and not personal, it seems to be repugnant to principle to hold that such an action may be brought. Many public officers might be suggested, who would otherwise be liable for defaults not their own, to a multitude of private actions, by persons to whom they owed no particular *321 or special duty ; and few competent men under such a rule of law, would be found to assume their duties and responsibilities. The case of a postmaster, who appoints all his own assistants, and is, in a general sense, responsible for their acts as for his own, will illustrate the liability claimed. Yet it has been most solemnly adjudged in England, that an action against him cannot be maintained (Lane v. Colton, 1 Ld. Raym. 646, S. C. 1 Salk. 17; and Whitfield v. Lord Le De Spencer, Cowp. 754). We need not mention analogous examples. They will suggest themselves to every mind.
It seems to us, the true distinction is that we have mentioned. When the duty is to individuals specially, for a reward emanating from them, a civil action may be brought for neglect, whether of themselves, or of their subordinates ; but when it is a duty to the public generally, undertaken alike for all citizens, the remedy for neglect is by indictment only, together with removal from office, when prescribed by law. It is not necessary in this case, however, to assert an exemption beyond that, from a liability for the acts of deputies or subordinate officers. If we are right in this conclusion, no civil action can be brought against commissioners of highways, for a neglect to repair, even if they had funds ; and by analogy, the corporation is not liable in such an action, whether the injury occurred upon a street or road, or in the latter event, whether the proof showed that it had sufficient funds or otherwise. Both the commissioners in towns and this corporation have under them overseers of the highways who have the immediate charge of the roads, and with this difference, that the corporation in 1849 had the appointment of the overseers, and those commissioners have not.
The only known instance in this state, of an attempt to enforce a civil remedy, in respect of highways, is the case of Bartlett v. Crozier, (17 John. 439,) where the action was brought against an overseer of highways, and the court for the correction of errors unanimously decided it could not be upheld. The only opinion delivered was that of Chancellor Kent, who, in a very learned examination of the law, held that the overseers were, in no event, thus liable ; and expressed his most decided opinion, that the same was true of the comrois *322 sioners. He said, the argument to be drawn from the English law on the subject, was very strong against the right of action. And we may add, that the fact of the opinion having been acquiesced in for more than thirty years, when injuries from defective highways are of such frequent occurrence, is also very strong against any such right of action. We do not think the authorities cited in behalf of the plaintiffs, impair the force.of the distinctions we have pointed out, nor show any peculiar liability attaching to corporations.
Great stress was laid upon the case of the borough of Lyme Regis, before cited, and especially upon the language of Park, J., in his opinion in the House of Lords, (1 Bing. N. C. 222,) who says, “ It is clear and undoubted law, that wherever an indictment lies for non-repair, an action on the case will lie, at the suit of a party sustaining any peculiar damage.” The learned judge was speaking of corporations and individuals to whom franchises had been granted, either on condition that they should repair, or do certain acts, or where they had assumed to perform the same, in consideration of property or franchises conferred upon them ; and he applied the rule to the case before him, as one of the former class. In the case cited by him from Carthew & Shower, the duty, and hence the agreement, was implied from the nature of the franchise granted—it being the privilege of keeping a ferry ; and the duty implied, that of ferrying over the inhabitants who came to use it. We cannot - imagine that Mr. Justice Park, in his general observation, intended to be understood as saying, that wherever an indictment lies for not repairing a common highway, a civil action will lie in favor of a person peculiarly injured by it, when the whole history of the English law is adverse to such a doctrine. We have before referred to some of the evidences of this ; and while the books are full of precedents, and cases of indictments against parishes for such non-repair, not a case of a private action for that cause is to be found. The case of Hall v. Smith, (2 Bing. 156,) decided in the court where Park, J., . was then a judge, and Harris v. Baker, (4 M. & Sel. 27,) are inconsistent with the universal application claimed lor his observation above quoted. As a direct authority, we have already shown that the case of Lyme Regis does not apply here. *323 It bears upon the duty assumed or exacted .by a charter or public grant, in respect of a franchise granted, whether to a public or private corporation, or to an individual; but not to a public power or duty, created by statute, irrespective of franchise, whether vested in a public officer, or in a municipal corporation. This dictum and decision in the case of Lyme Regis, has been cited to support several judgments in this state, for which, we humbly submit, they were no warrant. Before noticing those, however, we will refer to one or two other authorities relied upon by the plaintiffs. Thus, in the People v. the Corporation of Albany, (11 Wend. 539,) Nelson, J., after speaking of the power of that corporation to cleanse the basin, for the neglect of which they were indicted, says: “ It is impossible to distinguish, in reference to the subject in question, between their power and their duty,” and that they are bound to execute the municipal powers conferred upon them, when demanded by the public interest. He further says, that, “ when a corporation, or individuals,- are bound to repair a public highway, they are liable to indictment. in behalf of the public, and to an action on the case in behalf of an individual who has sustained a particular injury ;” citing several authorities, not one of which sustains the latter' proposition. As to the corporate duty being commensurate with its power, besides the objection that such a rule divests a municipal corporation of all its legislative discretion, it is not consistent ■ with our decision in Levy v. the City of New York, (1 Sand. S. C. R. 465,) in the correctness of which, we believe, all our associates concur. And as to the civil liability for the non-repair of highways, besides what we have said of it, we ought to add, that it is a dictum, not at all called for by the pending discussion. In the. Croton Dam case, also cited by the plaintiffs, Bailey v. the Mayor, &c., of New York, (3 Hill, 531, 541,) Ch. J.. Nelson puts the liability of municipal corporations, as s.uch, and in respect to their charters, upon the true ground, viz.:— that in their private character as owners of lands, &c., they- are ■ to be regarded in the same light as private persons owning lands ; and as such owners, are bound to repair roads, &c., as individuals are bound in like circumstance. He cites the ease-of Lyme Regis, the borough of Lyme, and others ; and he might ■ *324 have included, on their authority, the instances of duty, ratione tenures, devolved upon such corporations as well as upon individuals. In the Mayor, &c., of New York v. Furze, (3 Hill, 612,) Nelson, Ch. J., cites the Lyme Regis case, and the observation of Park, J., before quoted, and treats the latter as sound law, in its general application. ' The suit was for damages arising from the defective condition of a sewer; and the ground' upon which it seems the court finally held the corporation to be liable was, that as the sewer was built at the' expense of the owners of the adjacent houses and lots, they acquired a right to its common use; and a corresponding duty devolved upon the corporation, to keep it in proper condition and repair. This decision was much relied upon, as showing that the corporation was bound to keep in repair both streets and sewers, after they were once made, but the reasoning concerning the sewer, is inapplicable to a street or road made at the general expense. The general language used by the chief justice in respect to the civil liability of the corporation, for its omission to make new sewers, founded upon the grant of power for that purpose, was' not necessary for the decision of the case, and was subsequently re-considered, and in effect repudiated by the same court, in Wilson v. the Mayor, &c., of New York, (1 Denio, 601.)
We have already spoken of the Croton Dam case, which was one of those relied upon by the plaintiffs. We suppose it is not applicable. One judge went on the ground of agency, (2 Denio, 453,) but most of the judges put their decision on the point that the work was undertaken by the corporation, on land and for a work, which were its own absolute property, and thus the dam was built for its private and exclusive pecuniary benefit. (3 Hill, 539, 451; 2 Denio, 444, 450.) The authority of that case appears to have been much shaken, if not overthrown, by the recent decision of the court of appeals, in Blake v. Ferris.
The cases of turnpike and bridge companies cited by the plaintiffs require no comment. Their liability is the same as that of private individuals. So of those where parties have been held liable for obstructions placed by them in highways, which belong' to the class of actions for private nuisances, and are not parallel. That of Pierce v. Dart, (7 Cow. 609,) is in *325 effect over-ruled by Lansing v. Smith, (8 ibid, 146, and 4 Wend. 9,) and is opposed to Dougherty v. Bunting, (1 Sand. S. C. R. 1,) and Thayer v. the City of Boston, (19 Pick. 514.)
So much for the cases referred to by the plaintiffs, as showing a liability to repair, and warranting the action against this municipal corporation. In respect of the civil liability of public officers in general, the case of Adsit v. Brady, (4 Hill, 630,) before referred to, is the strongest authority against the general distinction we have taken. The duty of the defendant, as superintendent of repairs on the canal, was one due to the public at large, and not to any individual, either specially, or for a fee or reward, payable by him. The liability was taken for granted, by the distinguished judge who delivered the opinion of the court, without discussion or reference to authority ; and yet, so far as we know, there is no reported adjudication, in this state or in England, which sanctions a private action in such a case. And with much deference, we submit, that a decision making such a great stride, in asserting the liability of public officers, is not entitled to the full weight of authority, where it appears not to have been made upon grave argument and mature consideration. We need not. however, dispute the case, for it does not apply to any action against a public officer, for the neglect of his deputy or subordinate.
As we have already observed, it is not asserted that a municipal corporation, acting as commissioners of highways, is liable to a private action for neglecting to repair the roads under its charge, to a greater extent, or otherwise, than the officers known as commissioners of highways in towns, are liable under the like circumstances. And we are not satisfied that for a negligence merely, any private action can be sustained against those officers. If the case were one of a street, instead of a highway, thus falling under the 175th section of the act of 1813, the corporation, as performing a public duty under a statute of the state, by its subordinate officers, would, we think, be justly esteemed to act in a quasi official capacity, and be subject to no other or greater liability than public officers would incur in the discharge of the like duties. Without deciding that point, as it is the case of a highway, in respect of which the corporation acts expressly as commissioners of highways, we cannot hold it responsible.
*326 On both grounds, the failure of the plaintiff to establish the absolute duty averred in his complaint, by the want of proof of the requisite funds to repair the avenue, and the immunity of the corporation, as commissioners, from private actions, for a neglect to repair, we think the cause should be decided in favor of the defendants.
We were much pressed, on the argument, with the monstrous consequences of the conclusion, which, after very careful and mature deliberation, we have now formed. We cannot heed that argument, where the law is plain. If there be a defect in the law, the legislature will remedy it. Several of the neighboring states have, by statutes, applied such a remedy. Our legislature, with that example before it, has deemed it wise to leave the subject to the rule of the common law. That rule, as we have laid it down, has been well understood and acted upon, in the towns of this state, for thirty years, without any serious evils having flowed from it. If its application in this city produce the apprehended evils, the remedy is in legislation, not in judicial decisions.
In my opinion, and in that of my brother Campbell, the judgment at the special term should be reversed; but, as a majority of the judges are of a different opinion, it must be affirmed.
Judgment for the plaintiffs, (a.)

 The judgment in these cases appears' to he fully sustained by that of the Court of Appeals, in the case of the Rochester White Lead Co. v. City of Rochester, 3 Comst. 463. (Reporter.)